SIMPSON v. HARPER.—111 S. W. (2d) 882.

Middle Section. July 17, 1937.

Petition for Certiorari denied by Supreme Court, Dec. 17, 1937.

432

Smith, Gilbreath & Roberts, of Morristown, and Walker & Hooker, of Nashville, for appellant.

Horace Osment, of Nashville, for appellee.

FAW, P. J. This suit was brought in the chancery court of Davidson county, part 2, on January 22, 1934, by John W. Simpson, in his capacity as receiver of the First National Bank of Morristown, Tenn., against Mrs. Floyd I. Harper.

The complainant is the duly appointed and acting receiver of the

First National Bank of Morristown, Tenn., a national banking corporation under the acts of Congress. The defendant is a nonresident of the state of Tennessee, and a resident of the state of North Carolina. At the time of the transactions which gave rise to this litigation, defendant was a resident of Morristown, in Hamblen county, Tenn.

It is alleged in complainant's bill that defendant is justly indebted to the complainant, in his capacity as receiver as aforesaid, in the sum of $5,077.49, with interest from March 18, 1930, and reasonable attorney's fees, due by a promissory note, dated at Morristown, Tenn., April 23, 1929, in the principal amount of $7,000, due on or before July 23, 1929, payable to the order of the First National Bank of Morristown, Tenn., and signed by Morristown Buick Company (a partnership) and indorsed by J. W. Davidson, E. A. Davidson, R. F. Crooks, Mrs. Floyd I. Harper (the defendant), and Floyd I. Harper, on which just credits have been allowed, and said note is filed as an exhibit to the bill.

It is further alleged in complainant's bill that defendant is the owner of a specified undivided interest in each of eight separate parcels of real estate in the city of Nashville, Davidson county, Tenn. (all of which are fully described in the bill), and that defendant is a nonresident of the state of Tennessee so as to entitle complainant, under the statute, to an attachment of her property located within the jurisdiction of the chancery court of Davidson county, Tenn.

Briefly stated, the prayer of complainant's bill is for an attachment to be issued and levied on said property; for publication for defendant; for a decree for the amount due complainant, as receiver as aforesaid, on said note, principal and interest, including an attorney's fee of 10 per cent. of the total amount due, as provided in the face of said note, and that the property attached be sold in satisfaction of the decree, and for general relief. It is stated that this is the first application for an attachment in this cause.

Pursuant to a fiat of the chancellor, granted on preliminary application, an attachment issued as prayed for in the bill and was levied on the property therein described, and publication was made for the defendant.

On March 7, 1934, defendant filed an answer to complainant's bill, admitting that she now resides in the state of North Carolina and that she is the owner of interests in the property described in the bill, but denying that she is justly indebted to complainant as indorser of the note described in the bill, or in any amount on any account whatsoever.

Defendant admitted that she had signed her name as an indorser on the note described in complainant's bill and had delivered said note to the First National Bank of Morristown on or about April 23, 1929; but she alleged that her signature as an indorser on said note

and its delivery to the payee thereof were obtained and procured by such false and fraudulent representations of said First National Bank of Morristown, and such unlawful means and illegal consideration, that it was and is void and unenforceable. A more particular statement of the allegations of defendant's answer with respect to the matters last mentioned will be made later herein.

Proof was taken, by depositions of witnesses, on behalf of the parties, respectively, and thereafter the chancellor heard the cause and rendered a final decree dismissing the bill at complainant's cost, which decree embraced the chancellor's findings of facts, and was entered as follows:

"This cause came on to be finally heard on this May 30, 1936, and former days of the term before Chancellor, James B. Newman, on the entire record and argument of solicitors; from all of which the Court is of opinion and finds that the defendant, Mrs. Floyd I. Harper, was asked by her husband, Floyd I. Harper, to endorse the note involved in this suit and she repeatedly refused so to do; that she became worried about her husband's condition and finally decided to call Mr. C. D. Trobaugh, Vice President of the First National Bank of Morristown, Tennessee, the payee bank named in said note, and she called him over the telephone and told him she did not want to sign the note and asked him if it was necessary and thereupon he in substance told her it was absolutely necessary that she sign it and that she did not realize the seriousness of it, as it was a penitentiary offense and something had to be done about it immediately.

"This conversation took place after there had been an embezzlement of funds belonging to the bank by the partnership of which her husband was a member, and which fact she knew at the time the conversation took place; that upon this statement from the Vice-President of the bank, she signed the note and that her signature thereto was obtained by duress and fear, that her husband would suffer criminal prosecution, and the bank's title thereto is defective and it is not entitled to recover as against her on said note.

"The allegations of the bill are met and denied by the answer and are not sustained by the proof;

"It is therefore ordered, adjudged and decreed by the Court that the attachment heretofore granted in this case be and is dissolved, the original bill dismissed and the complainant and its surety taxed with the costs, for which let an execution issue."

An appeal by complainant from the foregoing decree was granted and perfected, and, in this court, complainant has filed and presented only two assignments of error, which are: (1) That "there is no evidence to support the judgment of the court;" and (2) that "the evidence preponderates against the judgment of the court."

It will be observed that there is no assignment of error directed

specifically to the chancellor's findings of facts. The complaint is that the judgment of the court is not supported by the evidence. The "judgment of the court" was that the attachment be dissolved, the complainant's bill dismissed, and complainant and his surety taxed with the costs. However, in the disposition of the assignments of error, we are not limited to such facts as were found by the chancellor, but it is our duty to consider all material facts in the record. Code, section 10620.

If, under applicable principles of law and equity, the "judgment" of the chancery court is supported by the preponderance of the evidence in the record, the judgment will be affirmed, whether this court agrees with the fact findings of the chancellor or not. Hamby v. Fouche, 15 Tenn. App., 248, 251, and cases there cited. But this latter statement is intended merely as an illustration of the scope and extent of the assignments of error in this case, and not as indicating an opinion that the chancellor's findings of facts are not supported by the evidence.

We here quote that part of defendant's answer containing her allegations with respect to the circumstances under which, and the inducing representations upon which, she indorsed the note in question and delivered it to the First National Bank of Morristown, as follows:

"This defendant would now show in answer to said bill and as an express plea in bar of the complainant's right to recover of the defendant thereon.

"(1) That at the time hereinafter mentioned the Morristown Buick Company was a partnership composed of R. F. Crooks, Floyd I. Harper, Milton E. Butler and J. W. Davidson, and was engaged among other things in buying and selling automobiles with offices and principal place of business at Morristown in the State of Tennessee.

"(2) That this defendant alleges on information and belief that prior to the month of April, 1929, the Morristown Buick Company executed and delivered to the First National Bank of Morristown its promissory note for the sum of $7,000.00, and as collateral and security for repayment of the indebtedness created thereby hypothecated with the complainant a series of notes owned by said Morristown Buick Company.

"(3) That this defendant is informed and believes and, therefore, alleges that said Morristown Buick Company, in April 1929, was insolvent and had not sufficient assets with which to meet or discharge its obligations; that it was duly adjudged a bankrupt in the United States District Court for the Eastern District of Tennessee in the latter part of 1929; that the solvency of the individual members comprising said partnership was exceedingly doubtful; that the complainant

with knowledge of such insolvency and with the intent to mislead, deceive and defraud the defendant, and to unlawfully and wrongfully obtain on the notes sued on herein the endorsement of this defendant, on or about the 25th day of April, 1929, procured its agent and vice-President, one Trobaugh, to contact your defendant and represent to her that M. E. Butler, who was in active charge of the Morristown Buick Company, had collected certain sums of money amounting to several thousands of dollars, due on the aforesaid notes owned by the Morristown Buick Company, and by it pledged to the First National Bank of Morristown, and had appropriated said funds to his own use; that said Trobaugh further represented that this defendant's husband, Floyd I. Harper, was liable to go to the penitentiary for the unlawful act of said Butler, one of his partners. This defendant's husband Floyd I. Harper then and now is traveling for Morgan-Hamilton Bag Company, and did not have active management of the business and as she is advised knew nothing and had no connection with any alleged embezzlement or misappropriation of funds by the said Butler, though he was thus threatened with criminal prosecution for the defalcation of the said Butler.

" (4) This defendant would further show that at the time this note was presented to her and the representations made to her as hereinabove set forth, the said note was then endorsed by J. W. Davidson, E. A. Davidson and R. F. Crooks, and she is now advised on information and belief and so alleges that their endorsements were fraudulently obtained by like representations as this made your defendant; that said J. W. Davidson and R. F. Crooks, who were also partners of the said Butler, was liable to go to the penitentiary for the unlawful acts of their partner Butler. The said E. A. Davidson was the father of J. W. Davidson and at that time a man of considerable wealth.

" (5) The defendant is now advised, and on information and belief alleges, that according to the representations made by Trobaugh that said note was not to be used after being endorsed by the said R. F. Crooks, J. W. Davidson and E. A. Davidson until it was endorsed by E. M. Grant, who at that time was amply solvent, and further endorsed by M. E. Butler and his brother along with other partners of said Morristown Buick Company, with good and solvent endorsers thereon as to each of them before same should become operative.

" (6) That this defendant is now advised, and on information and belief so alleges and charges, that complainant in violation of the conditions, agreement and trust upon which the signatures of R. F. Crooks, J. W. Davidson and E. A. Davidson were obtained as endorsers on said note and delivered, and in furtherance of its scheme to cheat and defraud this defendant, wrongfully and unlawfully failed and neglected to procure the signatures hereinabove alleged, and to

advise your defendant of the condition attached to said previous endorsements at the time her signature was fraudulently obtained.

"(7) This defendant is further advised, and on information and belief alleges, that the First National Bank of Morristown, Tennessee, instituted suit against J. W. Davidson, E. A. Davidson and R. F. Crooks, the endorsers whose names appeared upon the note at the time the same was presented to her by the agent of complainant, in the District Court of the United States for the Eastern District of North Carolina, and that when the defenses herein alleged were interposed by said defendants in said cause the cause was dismissed and all efforts to collect said note from said endorsers were abandoned.

"(8) That the signature of this defendant to said note and its delivery by her to the complainant was obtained by reason of the representations fully set out hereinbefore; that said representations were false; that the complainant's said agent and officer making them knew same to be false and made same with the intention and purpose of deceiving and defrauding this defendant who believed said representations to be true and relied upon same fully; that said defendant alleges that by reason thereof she has already sustained great damage and will sustain further damage unless relief is offered her by this Honorable Court.

"(9) That at the time the defendant, Mrs. Floyd I. Harper, endorsed said note she received nothing therefor and was not indebted to the complainant in any sum whatever; that the sole consideration for the said endorsement was an unlawful agreement on the part of the complainant reasonably implied from all of the circumstances hereinbefore set forth, to not prosecute defendant's husband Floyd I. Harper, on alleged criminal charges of misappropriation or embezzlement of funds by the said M. E. Butler, partner of the Morristown Buick Company as aforesaid, and as such the illegality and invalidity of said consideration as well as the total lack of a good and sufficient consideration to support said endorsement, are here pleaded in bar of complainant's right to have and recover of the defendant Mrs. Floyd I. Harper on said endorsement."

In technical strictness, it may be doubted whether the defendant's answer, as drawn and filed, sufficiently presented the defense of "duress," which, to be relied upon, should be set up in the answer in a clear and unambiguous manner. Gibson's Suits in Chancery, 4th Ed., section 358.

The word "duress" does not appear in the answer, but this, of course, was not necessary if the alleged facts constitute duress in its legal sense.

"Duress, under the decisions, means a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do an act or

make a contract not of his own volition, but under such wrongful external pressure." Pride v. Baker, Tenn. Ch. App., 64 S. W., 329, 332.

But it is alleged in defendant's answer in the instant case that Mr. Trobaugh, vice-president of the bank, represented to defendant that her husband "was liable to go to the penitentiary for the unlawful act of said Butler, one of his partners," and that the signature of defendant to said note and its delivery by her to the bank was obtained by reason of said representations; that said representations were false; that complainant's said agent and officer making the representations knew them to be false and made same with the intention and purpose of deceiving and defrauding defendant, who believed said representations to be true and relied upon same fully.

██ ██ To constitute duress, the representations and conduct of the bank, through its representative, must have been sufficient "to destroy the free agency" of the defendant; but this "is a question to be determined by the age, sex, intelligence, experience, and force of will of the party, the nature of the act, and all the attendant facts and circumstances." Pride v. Baker, supra, 64 S. W., 329, at page 332.

Section 55 of the Negotiable Instruments Law of 1899, Code, section 7379, provides that: "The title of a person who negotiates an instrument is defective within the meaning of this law when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

██ ██ It is obvious, from an examination of the record in the court below, that the parties all understood and treated the defendant's answer as sufficiently interposing the defense of duress. Evidence in support of and in opposition to that defense was admitted without objection, and the chancellor treated that as the controlling issue in the case. In this court the case has been argued and briefed by able counsel for both parties upon the theory (at least tacitly assumed) that the defense of duress is sufficiently pleaded by the defendant.

"One of the most important results of the rule that questions which are not raised in the court below cannot be raised in the appellate court is that a party cannot, when a case is brought up for appellate review, assume an attitude inconsistent with or different from that taken by him at the trial, and that the parties are restricted to the theory on which the cause was prosecuted or defended in the court below. Accordingly, where both parties act upon a particular theory of the cause of action, they will not be permitted to depart therefrom when the case is brought up for appellate review. The same rule governs where the parties act upon a particular theory of defense or

of opposition thereto.'' 4 Corpus Juris Secundum, Appeal and Error, p. 465, section 241, citing many cases in support of the text.

We will therefore construe and treat the answer as sufficiently presenting the defense of duress. Nolen v. Family Loan Co., 19 Tenn. App., 108, 113, 83 S. W. (2d), 559.

As a convenient method of avoiding repetition herein, we may say that the paragraphs numbered (1) and (2) in that part of defendant's answer hereinbefore quoted, and that part of paragraph (3) therein relating to the insolvency and bankruptcy of the Morristown Buick Company and the bank's knowledge of such insolvency, are supported by practically undisputed evidence.

But the truth of defendant's allegations with respect to the representations of C. D. Trobaugh (representing the First National Bank of Morristown) to defendant, particularly the representation that defendant's husband "was liable to go to the penitentiary," etc., was a matter of dispute in the evidence.

The allegations in defendant's answer (therein made on information and belief) to the effect that the indorsements of J. W. Davidson, E. A. Davidson, and R. F. Crooks were procured by means of false representations, and that a nonsuit was taken in the suit brought against E. A. Davidson and others in Asheville, N. C., because said defendants pleaded such false representations as a defense, are not specifically mentioned in the findings and decree of the chancellor, and seem to have been abandoned by the defendant. The receiver, Mr. Simpson, testified that he ascertained, upon investigation that the two Davidsons and R. F. Crooks were insolvent, and that, for that reason, the suit at Asheville was voluntarily dismissed at his instance.

In this court the learned counsel for defendant has, in substance, confined his contentions to the propositions that: (1) The proof supports the allegations of defendant's answer with respect to the representations of Mr. Trobaugh to defendant; and (2) that the title of the bank (and its receiver) was, and is, therefore, "defective" by virtue of the statute hereinbefore quoted. Code, section 7379.

Counsel for complainant take issue with defendant's counsel upon the first of the two propositions just stated, but do not question the second of the two propositions in the event the first proposition should be sustained.

The issue of fact thus presented is to be determined mainly upon the testimony of three witnesses, viz., the defendant Mrs. Floyd I. Harper, her husband, Floyd I. Harper, and C. D. Trobaugh, active vice-president of the First National Bank of Morristown (at the time of the transactions here involved), who, so far as the record discloses, represented the bank in all of the transactions involved in this case.

After it developed that M. E. Butler, one of the partners in the

Morristown Buick Company, had collected about $4,000 on notes which the Morristown Buick Company had transferred to the bank as collateral security, and had absconded, C. D. Trobaugh called Floyd I. Harper into conference and suggested that Morristown Buick Company execute a new note, with personal indorsers, to cover its debt to the bank. With a view of effecting this arrangement, Trobaugh and Floyd I. Harper went to Asheville, N. C., to obtain the indorsement of R. F. Crooks (one of the partners), and to Murphy, N. C., to obtain the indorsement of J. W. Davidson (another one of the partners), and also the indorsement of E. A. Davidson, the father of J. W. Davidson, who was at that time a banker at Murphy, and was reputed to be a man of large means. Crooks and the two Davidsons indorsed the note, and Trobaugh and Harper returned to Morristown, where the note was presented to the defendant, Mrs. Harper, by her husband, with request for her indorsement.

We quote portions of the testimony of Floyd I. Harper as follows:

"Q. Did you sign the note in the amount of $7,000.00 on April 23rd, 1929, in favor of the First National Bank of Morristown, Tennessee? A. I did.

"Q. Under what terms and conditions did you sign that note? A. This new note of $7,000.00 was to take the place, or replace another note which the bank held with collateral paper.

"Q. Who asked you to sign the note in the amount of $7,000.00, dated April 23, 1929? A. Mr. C. D. Trobaugh, who was Vice-President of the First National Bank, of Morristown, Tennessee. This was brought about, due to the fact that there had been moneys collected on these collateral notes, which should have been credited at the bank; and when Mr. Trobaugh discovered this, he called the same to my attention.

"Q. What did Mr. Trobaugh say to you with reference to making a new note? A. Mr. Trobaugh called my attention to this about noon, and in such a way that I realized it was in a rather dangerous position.

"Q. In what way do you have reference to? A. Creating a criminal offense.

"Q. Use the terms and substance, as near as possible, as to exactly what Mr. Trobaugh said to you about signing a new note? A. Mr. Trobaugh said it would be necessary that we get the collateral papers notes out of the bank and in our own hands, where the proper credits could be made. It happened that the credits that were paid on these notes were entered upon our books, and that the only way we could get the collateral notes from the bank was to furnish the bank with a good and solvent note. Then it was that he and I agreed to make the trip to Asheville, N. C., to discuss this matter with Mr. R. F. Crooks; then to proceed on to Murphy, N. C., to further discuss it

with Mr. J. W. Davidson. En route to the above places, Mr. Trobaugh mentioned of the seriousness, which we were in, and by the time I had reached Asheville, I was so stirred up over the matter Mr. Crooks was sick in bed at that time, and Mrs. Crooks didn't want me to talk with him regarding our case.

"Q. Mr. Harper what did you have reference to in the above statement about the seriousness of the case? A. I was led to believe that I was liable for the penitentiary if this wasn't settled or got straightened out. . . .

"Q. Did you have your wife, Mrs. Floyd I. Harper, to endorse the note dated April 23, 1929, in the amount of $7,000.00, in favor of the First National Bank of Morristown, Tennessee, wherein Morristown Buick Company was maker? A. I took the note up to our home, and asked Mrs. Harper to endorse it. She refused me at first. After a rather lengthy argument, she decided to phone Mr. Trobaugh and further discuss with him about her endorsing the note, and she finally agreed and endorsed the note.

"Q. What statement, if any, did you make to Mrs. Harper, or what enticement or inducement, if any did you make to Mrs. Floyd I. Harper your wife to sign the note?

"Plaintiff notes an exception, for that any statement made by the witness to his wife, as to why she would endorse the note, would be incompetent in so far as the First National Bank or the Receiver of the First National Bank is now concerned in her being present, participating in, or apart from any agreement with this witness might have had with Mr. Harper. (Sustained)

"A. I asked Mrs. Harper to endorse the note, and explained to her that we were in a serious condition. She wanted to know, of course, what I meant. I said it looked like we were all headed to the penitentiary if we couldn't get this straightened out, and that Mr. Trobaugh would not accept the note without her endorsement. Then it was she went to the phone to discuss this with Mr. Trobaugh.

"Q. Did you hear Mrs. Harper's conversation, if she had one, with Mr. Trobaugh? A. I did.

"Q. What conversation did you hear between Mrs. Harper and Mr. Trobaugh? A. Well, that would be hard to say. All I could understand of course, was what Mrs. Harper had to say. I didn't hear what Mr. Trobaugh had to say to her. . . .

"Q. At the time Mrs. Harper signed this note, what property did she have at that time in her own name? A. Not any.

"Q. Later her father died? A. Yes.

"Q. And she does now have an interest in property? A. Yes.

"Q. Mr. Harper, as I understand it, Mr. Trobaugh led you to believe you would be prosecuted in the criminal courts of Tennessee, because Mr. Butler had absconded or embezzled, or gotten away with

some of this money? A. Yes, sir. I was practically scared to death when I got to Asheville here, and I was so scared that Mrs. Crooks would not let me talk to Mr. Crooks."

We also quote portions of the testimony of the defendant, Mrs. Harper, as follows:

"Q. Mrs. Harper, did you sign or endorse a note in favor of the First National Bank of Morristown, Tennessee, in the amount of $7,000.00 dated April 23, 1929? A. I did, but I would like to explain why I did it.

"Q. Go ahead. A. Mr. Harper, brought the note around to our home, and I refused, and refused and refused.

"Q. Your home? Where do you mean? A. Morristown, Tennessee. And I refused and refused to sign it, but I had been so worried about Mr. Harper, we were afraid he would commit suicide or something desperate. I decided I would call Mr. Trobaugh, this Mr. Trobaugh, Vice-President of the First National Bank of Morristown, Tennessee, and I told him that I didn't want to sign this note, and asked him if it was necessary and he said that it was absolutely necessary that I sign it, and I told him I didn't want to, and he said I didn't realize the seriousness of it, and that it was a penitentiary offense, and that something had to be done about it immediately and I told him still that I did not want to sign it, and I asked him who else was going to, and he said he had secured the Davidsons' signatures and Mr. Crook's.

"Q. What Davidsons? A. J. W. and E. A. Davidson.

"Q. And what else? A. And that he would secure Mr. M. E. Butler and his brother's signatures and another solvent man or two, and he mentioned Mr. E. M. Grant that he thought he would sign the note, and I need not be uneasy about that, there were too many good men on it for me to be worried about the note, and after realizing the seriousness of it, I signed the note and gave it to Mr. Harper.

"Q. Mrs. Harper, would you have signed this note if Mr. Trobaugh, Vice-President of the First National Bank of Morristown, Tennessee, had not told you that your husband would be put in the penitentiary if you failed to sign it? A. No, never.

"Q. Is that why you signed it? A. Yes. . . .

"Q. After you signed this note, Mrs. Harper, were you ever informed or was any demand from the First National Bank of Morristown ever made on you for payment of any interest or any part of the principal? A. Before I signed it?

"Q. And again after you signed it? When was the first time any demand was ever made on you for the payment of this note or any part of said note, or any interest or any part of interest, prior to the time you were served with a copy of the complaint, wherein you were the defendant? A. That is the first time I heard of the note

after I signed it, or heard anything about it, except it was mentioned to me in a round about way one day.

"Q. Did any of the agents or officers of the First National Bank of Morristown, Tennessee, ever make any demand on you for the payment of the note or any part of the interest? A. No.

"Q. Mrs. Harper, is there any other statement that you would like to make as to why you signed the note, that you have not already stated? A. No, I don't think so, because that was the reason why I signed it, to save my husband from the penitentiary.

"Q. And that representation was made to you by Mr. Trobaugh, who was then Vice-President of the First National Bank of Morristown, Tennessee, and was the agent? A. Yes sir.

"Q. Mrs. Harper, at the time your husband became financially interested in Morristown Buick Company or any date thereafter until same went into receivership in Morristown, Tennessee, did you ever have any monetary interest in said business? A. No.

"Q. Did you ever loan your husband any money to put in said business? A. No.

"Q. Did you derive any profit or income from said business? A. No. . . .

"Cross-Examination.

"Q. Now, Mrs. Harper, at the time you did actually endorse this note, you had no property in your own name? A. No.

"Q. Your father lived in Nashville? A. Yes.

"Q. When did he die? A. 1931? Isn't that awful, I don't remember?

"Q. 1932? A. Was it? I had lived in Charlotte two years.

"Q. Now, after your father's death, you potentially did come into some property there? In other words, it has not been divided? A. Yes. . . .

"Q. You never talked to Mr. Trobaugh personally, but talked to him over the phone? A. Yes, but I knew it was him.

"Q. And you told him at that time what? A. That I didn't want to sign the note.

"Q. That you didn't want to sign the note? And what did he tell you? A. He told me he didn't think I realized the seriousness of it, and asked me if I didn't know it was a penitentiary offense for anybody to do a thing like that.

"Q. Whose name did he mention when he said it was a penitentiary offense? A. Well, I thought he was going to involve all the personnel. That was my understanding.

"Q. Did he mention Mr. Harper's name specifically? A. Yes. He asked me if I knew that involved my husband. That was the only reason I signed it.

"Q. Was there at that time any criminal warrant or indictment against Mr. Harper? A. Nothing that I knew about.

"Q. And if you did sign it upon the statement by Mr. Trobaugh that it was a penitentiary offense to take the money that belonged to the bank, you did that for your husband? Is that right? A. Yes.

"Q. Did you investigate at that time as to whether or not your husband was guilty of any offense against the criminal laws of the State of Tennessee? A. No, but I should have. If I had, I would not have signed the note. I did not dream that Mr. Trobaugh as executive of a bank, would tell me anything like that and it not be true, I didn't doubt his word for one minute.

"Q. Your husband was insisting that you sign this note, also? A. Yes, because Mr. Trobaugh had told him that I must before they would accept it.

"Q. That is what he told you? A. Yes."

On the other hand, C. D. Trobaugh testified as a witness for the complainant, and we quote excerpts from his deposition as follows:

"Q. What did you find out about the notes then in the bank and whether or not some money had been collected on these notes? A. I found out the notes that had been discounted at the bank or with us as collateral, I do not recall which, had been collected by the Morristown Buick Company and the money not turned over to the bank at all.

"Q. What kind of notes were they? A. Notes on the cars, title retention notes?

"Q. When you found that out, as a result of that, what did you do? A. Well as I recall I went to the office and discussed with the owners whoever they were there at the office at the time, I don't remember which probably all of them.

"Q. What, if anything, did you propose at that time that the partners in this company do? A. Well now I am giving you my best recollection, as I remember I advised them that the notes would have to be replaced with good and solvent notes, or we would have to have the notes at the First National Bank properly secured.

"Q. As a result of that conference did you or not go with Mr. Harper who was then one of the partners, and get a note for the amount of what you had there in the bank? A. I could not say that it was the full amount of what we had in the bank, but it was a note that had been used as collateral, as I recall.

"Q. With whom did you work in getting that note that is in the hands of Jno. W. Simpson, Receiver? A. Mr. Harper, and I, as I recall, went to Judge Taylor's office and this was discussed in his office and it was decided that the best thing to do was to get in a car and go where Mr. Davidson lived, Murphy, North Carolina, and get him to endorse the note—the old gentleman.

"Q. What was the agreement about turning over such notes as you had there and other securities that had been discounted for the new note so given for the amount of the loan in the bank? A. I agreed to surrender the notes held as collateral provided this note was endorsed. .. . .

"Q. Mr. Trobaugh, what was your understanding as to whether or not Mrs. Harper would endorse that note before you left Morristown? A. I do not believe that was mentioned.

"Q. That was not mentioned? A. I do not remember it.

"Q. Did you bring the note back to Morristown then, endorsed? A. Yes. . . .

"Q. When you came back what did you do about having Mrs. Harper endorse this note? A. Mr. Harper took the note as I recall and brought it back with Mrs. Harper's endorsement.

"Q. Between the time that Mr. Harper took the note out and the time that it was brought back to the office did you have any conversation with Mrs. Harper about endorsing the note? In other words, did she call you on the phone? A. Mr. Smith, I do not recall it, she may have done it, but I do not recall it.

"Q. Did Mr. Harper bring the note back to the bank endorsed with Mrs. Harper's name on it? A. I suppose he did, I do not remember.

"Q. Was the note endorsed by Mrs. Harper? A. As I recall it.

"Q. Mr. Trobaugh did you at any time ever tell Mrs. Harper this or the substance of this; that her husband was a partner in this business and that she would have to endorse this note or that there was liable to be some prosecutions grow out of this? A. What kind of prosecutions?

"Q. Criminal prosecutions? A. No sir.

"Q. Did you ever at any time tell her that she had to endorse this note? A. I do not think that I ever told anybody that in my life Mr. Smith.

"Q. Did you tell Mr. Harper or Mrs. Harper that unless she did endorse the note that there would be some trouble about it? A. I do not know. I might have said there might be some trouble, I do not recall the conversation.

"Q. Did you ever at any time go to see Mrs. Harper about endorsing this note? A. I do not think so, I do not recall it. . . .

"Q. After that time did you again go to Murphy, North Carolina, about collecting this note? A. Yes.

"Q. Was the note then in the hands of the First National Bank as an asset? A. Yes.

"Q. Were any notices ever given or conversation ever had with you and Mrs. Harper about the payment of this note? Did you ever go and talk to her about paying any part of it? A. I do not recall.

"Q. Did you ever talk to Mr. Harper? A. Probably did. . . .

"Q. When you and Mr. Harper went to Murphy to see about this note, what did you know then? A. The note was in partial payments, so much every sixty or ninety days, and payments was past due and we went to see about collecting that payment.

"Q. At that time or any time did Mrs. Harper ever come to see you or tell you or write you or communicate with you in any way that she had signed that note under duress and she was not obligated for it? A. No sir, I do not recall it.

"Q. Up until the time the bank closed did she ever make any question as to her endorsement on that note? A. I do not recall her ever discussing it. . . .

"Q. At that time, or any time after April 1931, did Mr. or Mrs. Harper ever make any question or say that they had both signed this note under duress and for fear that Mr. Harper might be handled criminally for this money that was supposed to have been collected by the Morristown Buick Company and not applied to the notes here at the bank? A. They never mentioned it to me.

"Q. Did you have charge of this note at all times while you were in the First National Bank? A. I had charge of the notes, if they became past due they were put on my desk.

"Q. When this note first became due, you have already stated that you went to Murphy to see about it? A. Yes sir.

"Q. After that was this note at all times in your hands? A. I think so.

"Q. Mr. Trobaugh did you ever at any time threaten Mr. Harper with prosecution if this note was not fixed up? A. Criminal prosecution?

"Q. Yes? A. No sir.

"Q. Did you ever at any time tell his wife that he was subject to prosecution criminally? A. I never told anybody that.

"Q. Did you at any time suggest that Mrs. Harper sign this note or was that the understanding? Just tell all that you know. A. No sir, I do not recall, I don't know whether Mr. Harper suggested it or I suggested it, I do not recall. . . .

"Cross-Examination.

"Q. Mr. Trobaugh, you have testified that when certain collections had been made by the Morristown Buick Company on notes held as collateral that you immediately took the matter up with the members of the partnership? A. Yes sir.

"Q. If I understood you correctly, you state in your original examination that you advised them that other notes, good notes, must be given to you in place of those which had been collected? A. Yes, or the note secured.

"Q. Or that notes secured? A. Yes sir.

"Q. What did you propose to do in the event that they did not do

either of those things? A. The only recourse I had was to collect the notes off the men who had paid the Morristown Buick Company.

"Q. In that connection I will ask if you did not tell them that you would prosecute them unless they were fixed up? A. Criminally?

"Q. Yes sir? A. No sir, I did not.

"Q. You did have a telephone conversation with Mrs. Harper prior to the time that she signed this note? A. I do not recall.

"Q. You just don't remember whether you did or not? A. No sir.

"Q. You don't remember anything that happened in the conversation if you had it? A. No sir, I do not recall it, she might have called me but I do not recall it."

Mr. Trobaugh was, at the time he testified (November 26, 1935), fifty-three years of age. He had lived in Morristown for forty·years. He was a director of the First National Bank of Morristown from 1918 or 1920, and vice-president of said bank from 1925 or 1926, until the bank was closed. Six reputable citizens of Morristown, of long acquaintance with Mr. Trobaugh, testified that his general character and reputation was good, and that he was entitled to full faith and credit on his oath.

■ There was no evidence, or offer of evidence, tending to impeach the general character and reputation of the defendant or her husband, or their character for truth and veracity. Floyd I. Harper was not subject to criminal prosecution in the circumstances, for the reason that the embezzlement had been committed by one of his partners, without his knowledge. Although civilly liable for the debts of the partnership, he was not criminally liable for the unlawful acts of a partner done without his assent or knowledge.

■ ■ After reading all the evidence in this record, and repeatedly rereading much of it, we are of the opinion that the greater weight of the evidence supports the chancellor's findings and decree. The testimony of Mrs. Harper relating to the representations made to her by Mr. Trobaugh is positive and clear. Mr. Trobaugh admits that he may have had a conversation with Mrs. Harper at the time stated by her, but he says that, if he had such a conversation, he does not recall anything that was said at that time. In view of all the circumstances then surrounding the parties, and their respective relations to the matters under consideration, it is probable that Mrs. Harper would, after the lapse of several years, remember the things that occurred more vividly than Mr. Trobaugh, and a consideration of the situation of each of the parties at that time, in the light of the history of many similar cases written into the law reports, lends credence to the testimony of Mrs. Harper, and especially so when Mr. Trobaugh neither affirms nor denies so many important facts, but merely says he does not "re-call." "It is no imputation against the

veracity of a witness if the court attributes to him frailty of memory.''
Moore on Facts, vol. 1, sec. 17.

According to each witness a purpose to tell the truth, we think that, upon an application to this case of established rules for weighing evidence, the testimony of Mrs. Harper must be accepted as the truth of the case. Upon such facts the legal result is inevitable. See numerous cases cited in Casenotes and Annotations, as follows: 26 L. R. A. 48, 60; 20 L. R. A. (N. S.), 484; 37 L. R. A. (N. S.), 539; 43 L. R. A. (N. S.), 1005; 17 A. L. R. 336, 338. See, also, Kronmeyer v. Buck, 258 Ill., 586, 101 N. E., 935, 45 L. R. A. (N. S.), 1182, 1186; Ball v. Ball, 79 N. J. Eq., 170, 81 A., 724, 37 L. R. A. (N. S.), 539.

It results that the appellant's assignments of error are overruled and the decree of the chancery court dismissing complainant's bill at his cost is affirmed. The appellant and the surety on his appeal bond will pay the costs of the appeal.

Crownover and Felts, JJ., concur.