IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2007 Session

## RICKY HOLLOWAY ET AL. v. CYRIL EVERS, ET AL.

**Appeal from the Circuit Court for Maury County**
**No. 11255      Robert L. Jones, Judge**

_____

**No. M2006-01644-COA-R3-CV - Filed December 6, 2007**

_____

A contractor who was a partner in a subdivision development venture sold his interest to the other partners for $175,000. He subsequently filed a complaint against them alleging that they had deliberately taken advantage of his weak financial and physical condition to force him out the partnership. His complaint included claims for violation of fiduciary duty, duress and fraud. The trial court dismissed the contractor's claim on summary judgment. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and DONALD P. HARRIS, SR. J., joined.

Brent Horst, Nashville, Tennessee, for the appellants, Ricky Holloway, Holloway Inc.

Dalton M. Mounger, Columbia, Tennessee, for the appellees, Cyril Evers, Taylor Golden and CTR Properties.

## OPINION

### I.  A BUSINESS PARTNERSHIP

The plaintiff in this case, Ricky Holloway ("Holloway"), was a contractor in the business of land excavation and housing construction. In the year 2002, he identified a 203 acre piece of property in Maury County that he believed would make a good location for housing and commercial development. With the consent of its owner, James Rice, Mr. Holloway proceeded to perform excavation on the property with the intention of eventually purchasing it, subdividing it, and selling it off as residential and commercial lots. He retained the services of an engineering firm to create a plat to submit to the Maury County Planning Commission, and he obtained preliminary approval from the Commission for the proposed subdivision.

Mr. Rice was willing to sell the property, but unfortunately for Mr. Holloway, he did not have the $2 million that would be required to purchase it, nor was he in a position to negotiate a sufficiently large loan. Defendants Cyril Evers and Taylor Golden apparently possessed greater financial resources. They were also in the business of building and land development, and they had become interested in the Rice property as well. On July 15, 2004, Mr. Holloway, Mr. Evers and Mr. Golden entered into an agreement that created a new partnership, CTR Properties, to acquire and develop the property.

The partnership agreement recited that each partner would contribute 33.3% to the capital of the partnership and that the capital contributions of each party would be equalized at each stage of development. The agreement allowed some of the contributed capital to be in the form of services, like bush hogging and bulldozer work.

Cyril Evers was named the trustee of the property acquired by the partnership to serve as its attorney-in-fact as to all deeds and other relevant legal documents and to manage its everyday business. Mr. Holloway stated that he deferred to Mr. Evers becoming trustee because Evers had greater experience in property development. Although not stated in the agreement in so many words, the parties agree that it gave Mr. Evers the sole authority to approve expenditure of funds for actual construction and development. A clause on transfer of partnership interest provided that no partner could encumber his interest in any way and could not sell or transfer his interest without first offering it for sale, in writing, to the partnership.

CTR Properties obtained a loan of $3 million from the Rutherford Bank & Trust to purchase the Rice property and to pay for construction costs on the first phase of development of what became known as MacHollow Estates. The purchase of the property closed on September 30, 2004.

Almost immediately after the property was purchased, disputes about money arose between Mr. Holloway and the other partners. According to Holloway, Evers and Golden decided to squeeze him out of the partnership when they learned that he had financial difficulties and, in order to do so, they asked him for contributions of money that the partnership did not need, refused to allow him to contribute his services to the partnership in lieu of cash, and refused to move the project along expeditiously, all in order to pressure him to sell.

According to Mr. Evers and Mr. Golden, the money Evers asked for was needed to service the loan the partnership incurred and to pay for planning and utility development on the property. They also claimed that Mr. Holloway tried from the very beginning to get them to buy out his interest for an exorbitant amount, and they alleged that this had been his intention all along.

In any case, an exchange of letters ensued in which the partners discussed their relationship and history and made various offers and counter-offers for the sale of partnership interests. On January 7, 2005, Mr. Holloway sent a letter to his partners in which he declared that after discussing the matter with his wife and "with my health the way it has been and being in and out of the hospital, I feel it would be in our best interest to walk away from this project."

-2-

He offered to sell his share in the partnership for $175,000 on the condition that he be released from liability for all debts of the partnership, including the bank loan. In exchange, he offered to release Evers and Golden from claims for any work he had done. Mr. Holloway's letter stated that,

> I truly hope we can settle our dissolution at this amount. I believe it is a fair and reasonable amount and my last offer. If either of you are not interested in this amount I do feel I have an interested party who would be willing to buy my interest at this amount as stated in paragraph 10 of our partnership agreement.

Mr. Evers and Mr. Golden accepted the offer, paid Mr. Holloway $175,000 and executed the documents necessary to place the partnership in their names only. About a year later, CTR sold most of the acreage in MacHollow Estates for $3.3 million, retaining the remainder of the property for the partnership.

## II. LEGAL PROCEEDINGS

On May 31, 2005, Ricky Holloway filed a complaint against Cyril Evers, Taylor Golden, CTR Properties and Community First Bank and Trust in the Circuit Court of Maury County.[1] He claimed that Evers and Golden had imposed a fraud upon him, that they were in breach of their fiduciary duty to him as members of the same partnership, and that the sale of his partnership interest was invalid because it was made under duress. He asked for $5 million in compensatory damages for lost profits and $5 million in punitive damages.

The defendants filed an answer which denied any wrongdoing on their part. They also asserted counterclaims against Mr. Holloway for fraud in the inducement of the partnership, and fraud in the inducement of the purchase of Holloway's partnership interest. On March 29, 2006, they filed a Motion for Partial Summary Judgment, asking the court to dismiss all the claims against them. The competing parties submitted statements of undisputed material facts, which were placed in the record together with the responses to those statements. *See* Tenn. R. Civ. P. 56.03. After a hearing, the court granted the defendants' motion and dismissed Mr. Holloway's claims.

The court's order, dated July 17, 2006, contained a brief recitation of the history of the transactions between the parties and granted summary judgment to the defendants. It also declared that the remaining claims of Evers, Golden and CTR against Holloway were reserved, but that as there was no just reason for delay, the summary judgment was certified as final for purposes of appeal under 54.02 Tenn. R. App. P.

## III. SUMMARY JUDGMENT STANDARDS

---

[1] The plaintiff withdrew his claim against Community First Bank and Trust on January 26, 2006.

Summary judgment is an appropriate vehicle for resolving disputes if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993).

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Draper v. Westerfield*, 181 S.W.3d 283, 288 (Tenn. 2005); *BellSouth Advertising & Publishing Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 284 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). In our review of such a decision, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all the reasonable inferences that can be drawn from that evidence. *Draper v. Westerfield*, 181 S.W.3d at 288; *Doe v. HCA Health Services, Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

We thus must determine first whether factual disputes exist and, if so, whether the disputed fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). "If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Byrd v. Hall*, 847 S.W.2d at 211.

## IV. UNDISPUTED FACTS

Before directly addressing the issues raised on appeal, we must first give a more detailed account of the events leading up to the sale of Mr. Holloway's partnership interest to the defendants. Although the parties have offered sharply differing explanations as to their own motivations and those of the opposing parties, most of the facts alleged by the plaintiff are not in dispute. Other facts have been admitted by the defendants for purposes of summary judgment only, although they deny all imputations as to improper motive. The defendants contend, however, that the alleged facts, even as admitted, are not sufficient to sustain any of the plaintiff's claims.

According to Mr. Holloway's complaint, three days after the partnership closed on the $3 million loan, a loan officer from Community First Bank, which held construction loans on other properties belonging to Mr. Holloway, disclosed to Cyril Evers that Mr. Holloway needed money and that "he is behind on some notes." Mr. Holloway alleged that upon disclosure of this information, Mr. Evers and Mr. Golden decided to squeeze him out of the partnership.

Mr. Golden allegedly offered to purchase Holloway's partnership interest on October 3, 2004 in exchange for a one acre lot from the Rice property. Mr. Holloway refused the offer. On October 11, the Spring Hill Planning Commission held a meeting at which it considered and approved a "concept plan" for a development of 413 single-family dwellings on 181 acres of MacHollow Estates. Mr. Golden attended the meeting, but Mr. Holloway did not. According to an account in

the Columbia Daily Herald the following day, Spring Hill resident Peter Jenkins addressed the commission with concerns about Mr. Holloway's participation in the project.

Mr. Jenkins complained that Mr. Holloway had done a substandard job of building a house for Mr. Jenkins' daughter, and he cited numerous mistakes with the installation of insulation, siding, roofing, utility trenches, stairs, railings and tiling. Property appraiser Cindy Williams was quoted as saying that the house in question was "one of the worst new construction houses I've ever seen." Questioned by the Commission as to what Mr. Holloway's involvement in the proposed project would be, Mr. Golden reportedly responded, "[t]o set your mind at ease, he won't be building any homes on this property."

On October 13, 2004, Mr. Holloway sent a letter via certified mail to both partners. He cited the earlier offer from Mr. Golden and the comment that was quoted in the Herald, and stated that "[i]t is apparent that each of you now want me to remove myself from this partnership," and further, "[t]his issue may be considered at a later date per review of legal council (sic)." He then set out three offers to sell all or part of his partnership interest, including an offer to transfer his entire interest in the partnership to them for $699,300.

In a letter dated November 17, 2004, Mr. Evers and Mr. Golden rejected Mr. Holloway's offer, and presented two possible counter-offers: to sell their partnership interests to Mr. Holloway for a total of $250,000, or to buy his interest for $125,000. The letter stated that receiving the Planning Commission's approval was proving to be more difficult than anticipated, that the partnership would have to increase its outstanding indebtedness by as much as $1 million, and that interest and taxes were costing the partnership $350 per day. It also stated that in order for the project to be successful all the partners would have to work together and have similar goals and aspirations. The letter concluded that in light of Mr. Holloway's last communication, it was apparent that the partnership was not stable and not capable in its present form of accomplishing its goals.

Mr. Holloway's reply, dated November 29, 2004, included his acknowledgment that the partnership was not stable, a rejection of the counter-offers in the previous letters, and a counter-offer of his own, to sell his interest for $250,000. Cyril Evers responded with a lengthy letter setting out in detail his thoughts and reservations about the project, summarizing Mr. Holloway's contribution of cash and work on the property, and concluding that $125,000 would be "a pretty good return" on his investment.

The next letter, dated January 7, 2005, was the one we discussed in the first section of this opinion. It contained Mr. Holloway's offer to sell his interest for $175,000, and the statement that "I believe it is a fair and reasonable amount and my last offer." As we stated above, Mr. Evers and Mr. Golden accepted Mr. Holloway's offer. The sale of his interest was finalized on February 1, 2005.

## V. ISSUES ON APPEAL

### A. FRAUD

Mr. Holloway argues that Mr. Evers and Mr. Golden committed fraud against him in the very formation of CTR Properties. According to his amended complaint, if he had located other investors Evers and Golden would have lost the opportunity to acquire the Rice property and they thus entered into partnership with him to avert that possibility, without any intention of acting in good faith towards him or of honoring their fiduciary duties. However, he admitted that he did not have an option or a contract to purchase the land. Therefore, Evers and Golden could have purchased it at any time without his participation.

The elements of fraud have been described as follows:

When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud. The representation must have been made with knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that misrepresentation to his injury.

*Brown v. Birman Managed Care*, 42 S.W.3d 62, 66-67 (Tenn. 2001); *See also First National Bank of Louisville v. Brooks Farms*, 921 S.W.2d 925, 927 (Tenn. 1991) (quoting *Haynes v. Cumberland Builders,* 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976)).

We note that the Rules of Civil Procedure require that averments of fraud be stated with particularity. Tenn. R. Civ. P. 9.02; *Black v. Black*, 166 S.W.3d 699, 705 (Tenn. 2005). However, Mr. Holloway does not indicate in his pleadings nor in his argument on appeal exactly what material existing fact the defendants misrepresented at the time the partnership was formed that he reasonably relied upon to his injury, and we have not found any evidence in the record of any such misrepresentation. Mr. Holloway has presented no evidence that would meet the elements necessary to establish a claim of fraud. Accordingly, the trial court properly granted summary judgment to the defendants on this claim.

## B. VIOLATION OF FIDUCIARY DUTY

Mr. Holloway also argues that in their subsequent dealings with him, the defendants violated the fiduciary duties they owed him within the partnership relationship. The parties all cite to the section of the Revised Uniform Partnership Act, Tenn. Code Ann. §§ 61-1-101 *et seq*, which sets out the standards that should govern a partner's conduct with the partnership and with the other partners:

(a) The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care as set forth in subsections (b) and (c).
(b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:
(1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the

partnership business or derived from a use by the partner of partnership property, including the appropriation of partnership opportunity;

      (2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

      (3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

(d) A partner shall discharge the duties to the partnership and the other partners under this act or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

(e) A partner does not violate a duty or obligation under this act or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

Tenn. Code Ann. § 61-1-404.

We note that Mr. Holloway does not allege that Mr. Evers or Mr. Golden failed to account to the partnership for any property, profit, or benefit derived from the partnership, or that they dealt with the partnership on behalf of any party having an adverse interest to it, or that they competed with the partnership in the conduct of the partnership business. He also does not allege that either defendant engaged in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of the law. He does claim that Evers and Golden acted in their own interest, but that is specifically permitted by Tenn. Code Ann. § 61-1-404(e).

The substance of Mr. Holloway's argument rests on the assertion that the defendants acted in a manner inconsistent with their obligation of good faith and fair dealing as set out in Tenn. Code Ann. § 61-1-404(d). He claims that the project was his "brain child" and that because he performed excavation work on the property and hired a firm to create a subdivision plat, he had created something that Evers and Golden were eager to obtain. In his letter of October 12, 2004, he summarized his own contribution to the venture as follows: "I have worked almost two years on the MacHollow development. I have contributed over $27,000 of my own money plus numerous hours of sweat equity to make this project work." However, as we noted above, Holloway did not have an option or a contract to purchase the land, and Evers and Golden could have purchased it at any time without his participation.

He further claims that once Mr. Evers and Mr. Golden learned that he was having financial difficulties, they determined to force him out of the partnership so they could unfairly keep all the profits for themselves. He alleges that Evers and Golden led him to understand that because the partnership borrowed $3 million and paid $2 million for the property, future cash contributions would come from each partner's share of the extra $1 million, which was borrowed to pay for construction costs. He complains that, instead, Evers decided for reasons of his own that the

partnership needed to borrow another $1 million, that he attempted to collect additional contributions from the partners, and that he did not allow Mr. Holloway to make his contribution in the form of services, as was permitted under the partnership agreement.

We note, however, that while the partnership agreement declares that each partner shall contribute 33.3% to the capital of the partnership, it nowhere states that no additional capital would be required beyond the initial loan. To the contrary, it specifically states that the partners' capital contributions would be equalized at each stage of the development, indicating that future contributions were anticipated. The defendants deny that they assured Mr. Holloway that no further capital contributions would be needed. Mr. Holloway has not filed an affidavit to support his claim that the defendants made such an assurance to him, and he has not pointed to any other proof in the record that might support his allegation. While under summary judgment standards we are obligated to consider the evidence in the light most favorable to the non-moving party, mere unsupported allegations are not evidence, and they do not raise genuine issues of material fact such as would preclude summary judgment. *Price v. Mercury Supply, Inc.* 682 S.W.2d 924, 929 (Tenn. Ct. App. 1984).

It appears to us that the partnership agreement contemplated that the partners would make capital contributions as needed, and that the agreement delegated to the trustee the task of determining the capital requirements for what was obviously a large and complex venture. The agreement charged the trustee to exercise his management duties "in his absolute discretion in the best interest of the partnership." Thus, Mr. Evers' determination that additional capital contributions would be needed does not indicate bad faith or unfairness just because the requirement put Mr. Holloway at a financial disadvantage. Further, even if Mr. Evers did not allow Mr. Holloway to make his contribution in the form of labor on the land instead of in cash, the trustee had the discretion to make such a decision if he felt it was in the best interest of the partnership.

In a related matter, Mr. Holloway cites Mr. Golden's conduct during the planning commission meeting as further proof of bad faith. He suggests that Mr. Golden should have publicly defended him or at least taken a neutral stance in regard to the accusations of shoddy workmanship made against him. However, he does not allege that Mr. Golden had any personal knowledge about the quality of the construction on the house that Mr. Jenkins complained so bitterly about, and it appears to us that it would not have helped the approval process along if Mr. Golden had insisted that Mr. Holloway had a significant role to play in the project at issue.[2]

At an early point in the partnership, the differences in opinion created a situation where change in the arrangement became almost inevitable. We cannot conclude that such a business decision constitutes a breach of fiduciary duty, so long as the partners dealt fairly with each other in the ensuing transactions.

---

[2]In his letter of November 29, 2004, Cyril Evers set out his thoughts on the matter: "After we closed and started trying to get approval from the City of Spring Hill, some people voiced their opposition to you as a builder. I realized that anyone can make a charge or complaint against anyone, whether or not it is true. But any time people make comments at a public meeting, in my opinion it does have an adverse effect."

The proof shows that Mr. Holloway was willing to sell his interest, and the final price became the only relevant question. Early on, he offered to sell his share in the partnership for almost $700,000. Evers and Golden countered with an offer of $125,000 for Holloway's interest, and an alternative offer to allow him to buy their interests for the same price: $125,000 for each of their shares or $250,000 total.

Mr. Holloway argues that this alternative offer was not genuine, because the partners knew he could not raise the money to buy them out. However, he suggested several times during the course of negotiations that he was in touch with other possible investors, and it therefore appears to us that by offering to sell their interests to him Evers and Golden ran the risk that he would in fact be able to recruit other buyers. After Evers and Golden declined Holloway's next counter-offer for $250,000, Holloway then presented his final offer to sell his interest in the partnership for $175,000, which the partners accepted. Holloway does not allege that Evers and Golden failed to pay him the full amount he asked for, or that they failed to honor any other provision of the sales agreement.

In sum, once differences arose, the partners began to negotiate for a sale of their interests. Mr. Holloway willingly entered into the negotiation process, ultimately reaching a final price in accordance with an offer that he himself chose to put on the table and to characterize as "a fair and reasonable amount." When we examine the substance and the sequence of these negotiations in the light most favorable to Mr. Holloway, we cannot find any breach of fiduciary duty by the defendants. Thus, we do not believe the trial court erred in dismissing that claim on summary judgment.

## C. DURESS

Tennessee has long recognized that a contract, although valid on its face, may not be enforceable if it can be proved that the contracting party acted under duress. The earliest cases of duress involve acts performed under threat of physical injury or harm. *See Belote v. Henderson,* 45 Tenn. (5 Cold.) 471 (1868) (sale of horse under threat of arrest by military authority); *Willard v. Willard,* 65 Tenn. (6 Baxt.) 207 (1873) (shotgun wedding); *Pride v. Baker*, 64 S.W. 329 (Tenn. Ch. App. 1901) (deed executed under death threat). However, in the leading case of *Johnson v. Ford,* 245 S.W. 531 (Tenn. 1922), our Supreme Court recognized that other forms of coercion than physical threats might constitute duress.

> The strictness of the common-law rule touching the matter of duress has been much relaxed in the development of the law. Originally "duress" meant only duress of the person, and nothing short of such duress, amounting to a reasonable apprehension of imminent danger to life, limb or liberty, was sufficient to enable the party to recover back the money paid. Subsequently, in keeping with the principles of equity and good morals, the doctrine was extended so as to recognize duress of property as a sort of moral duress, which might, equally with the duress of the person, entitle the party to recover back money paid under its influence.

*Johnson v. Ford,* 245 S.W. at 540 (quoting *Brown v. Worthington*, 142 S.W. 1082 (Mo. App. 1912)).

A party wishing to avoid a contract on the grounds of duress must prove that in forming the contract he or she had been forced or coerced to do an act contrary to his or her free will. It is said that a contract formed under such circumstances cannot be valid, because it lacks an essential element of a valid binding contract, the free and voluntary assent of the minds of the parties making it. *Loud v. Hamilton*, 51 S.W. 140 (Tenn. Ch. App. 1898). Thus, whether a party has alleged duress of person, duress of property, or economic duress, duress in the legal sense only exists "...when one by the unlawful act of another is induced to make a contract or perform some other act which deprives him of the exercise of free will." *Johnson v. Ford*, 245 S.W. at 86-87.

Duress is "a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do and act or make a contract not of his own volition, but under such wrongful external pressure." *Rainey v. Rainey*, 795 S.W.2d 139, 147 (Tenn. Ct. App. 1990) (quoting *Simpson v. Harper*, 111 S.W.2d 882, 886 (Tenn. Ct. App. 1937)). Duress consists of "unlawful restraint, intimidation, or compulsion that is so severe that it overcomes the mind or will of ordinary persons." *Boote v. Shivers*, 198 S.W.3d 732, 745 (Tenn. Ct. App. 2005); *McClellan v. McClellan*, 873 S.W.2d 350, 352 (Tenn. Ct. App. 1993).

In the present case, Mr. Holloway argues that the defendants took advantage of his relatively weak financial situation and some health problems he was experiencing to coerce him into selling his partnership interest, and that this likewise constituted duress of property. His allegations, in and of themselves, do not address the required elements of duress. Further, he has presented no evidence of any wrongful or illegal act by Mr. Evers or Mr. Golden or even improper external pressure. The financial and health problems he was facing were unfortunate and undoubtedly caused him stress. However, they were not caused by the defendants, and many people are required to make business and other decisions while facing such problems. There is simply no evidence that some action by the defendants deprived Mr. Holloway of his free will to make the best decision he could in the circumstances.

The defendants in the present case were not in a position to demand that Mr. Holloway sell his interest, nor did they attempt to do so. They presented several offers for such a sale, which he refused. For his part, Mr. Holloway also made several offers, which the defendants refused. Mr. Holloway made the final offer that the defendants agreed to, a price that he himself characterized as "fair and reasonable." We can see nothing in the give and take that preceded the agreement in this case to suggest that Mr. Holloway was coerced by the actions of Mr. Evers and Mr. Golden to such an extent as to deprive him of his free will.

In the present case, the parties were all experienced businessmen who were accustomed to buying and selling property. Their partnership agreement did not prohibit a partner from selling his interest to an outside party, but did require that the other partners be offered the first opportunity to buy. The negotiations between the partners stretched over several months. They communicated by letters which did not contain any threats or intemperate language. In the end, they agreed upon a price which was lower than the amount first suggested by Mr. Holloway, but greater than the amount first offered by his partners. Although Mr. Holloway claimed he only agreed to sell because of duress, he does not state that he had been deprived of his free will when he suggested a price of $175,000 for his partnership interest, and the evidence does not suggest any such deprivation.

Therefore, he has not raised any question of material fact that would preclude dismissal on summary judgment of his claim for duress.

## VI.

The order of the trial court is affirmed. We remand this case to the Circuit Court of Maury County for further proceedings. Tax the costs on appeal to the appellants, Ricky Holloway and Holloway's Inc.

_____
PATRICIA J. COTTRELL, JUDGE