Phillip A. RAINEY and William B. Rainey, Plaintiffs-Appellants,

v.

J.R. RAINEY, Tommy Ray Rainey, Joseph H. Mangum and Mary Jo Elam Mangum, Executrix of the Estate of Eugene Mangum, Deceased, Defendants-Appellees.

Joseph H. MANGUM and Mary Jo Elam Mangum, Executrix of the Estate of Eugene Mangum, Deceased, Counter-Cross-Plaintiffs-Appellees,

v.

J.R. RAINEY, Jr., Tommy Ray Rainey, Coleen F. Rainey, Cross-Defendants-Appellants,

Phillip A. Rainey, William B. Rainey, Counter-Defendants-Appellants,

and

William J. Rainey, Cross-Defendant-Appellant.

John R. RAINEY, Jr, Tommy Ray Rainey, Counter-Cross-Plaintiffs-Appellees,

and

Coleen F. Rainey, Cross-Plaintiff-Appellee,

v.

Phillip A. RAINEY, William B. Rainey, Counter-Cross-Defendants-Appellants,

William J. Rainey, Cross-Defendant-Appellant,

Phillip Anthony Rainey

and

Tracy Ann Buttrey, Cross-Defendants.

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 18, 1990.

Application for Permission to Appeal Denied by Supreme Court July 23, 1990.

T. Edward Lawwell, Lawwell, Dale & Grahm, Columbia, for plaintiffs-counter and cross-defendants appellants Phillip A. Rainey, William B. Rainey and William J. Rainey.

Tom W. Moore, Jr., Moore & Peden, P.C., Columbia, for defendants, counter and cross plaintiffs-appellees Joseph H. Mangum and Mary Jo Elam Mangum, executrix of the estate of Eugene Mangum, deceased.

Robert L. Jones and James W. Couch, Trabue, Sturdivant & DeWitt, Columbia, for defendants-cross defendants-counter and cross-plaintiffs-appellees John R. Rainey, Jr., Tommy Ray Rainey, and Coleen F. Rainey.

## OPINION

LEWIS, Judge.

This case involves a dispute over the ownership of a 157 acre farm (the farm) located in Maury County, Tennessee, and a

question of whether William J. Rainey, the beneficiary of his brother's life insurance policies and employee benefit plans, had an obligation to use the proceeds in a particular manner.

The majority of the parties in this case are related, and almost all of them share the same last name. We therefore provide an introductory synopsis of the names and relationships of the parties.

William J. Rainey and John R. (J.R.) Rainey were brothers raised in Nashville, Tennessee. William J. settled in Middle Tennessee and John settled in North Carolina.

William J. Rainey is married to Ann Rainey and they have four children, Phillip A., William B., Robert and Joanna. William J. has two grandchildren, Phillip Anthony Rainey and Tracy Ann Buttrey.

John R. Rainey, deceased, was married to Coleen Rainey and had three children, John R., Jr., Tommy Ray and Kathleen (Kathy). John died in 1984 and his daughter Kathy died a little over a year later.

## PROCEDURAL HISTORY

The original complaint was filed on 8 March 1986 by William B. Rainey and Phillip A. Rainey, the alleged part owners of the farm, against the other two named owners, J.R. Rainey and Tommy Ray Rainey, and against Joseph Mangum and Eugene Mangum, purchasers of the farm from Tommy Ray Rainey and John Rainey, Jr.[1]

In their complaint, William B. Rainey and Phillip A. Rainey asked the court to enjoin the Mangums from conveying the property that the Mangums had purchased from John Rainey, Jr., and Tommy Ray Rainey. William B. and Phillip A. also asked the trial court to grant them a one-half interest in the farm, or in the alternative, to award them a judgment in an amount equal to one-half of the value of the farm.

Soon thereafter, Tommy Ray Rainey sent a letter to Frank K. Dale referring to the

---

**1.** John Rainey, Jr., joined with his brother, Tommy Ray, in purporting to convey the farm by signing "J.R. Rainey" to the deed. It is undisputed that the "J.R. Rainey" on the original deed actually refers to their father, the deceased John Rainey.

action which had been filed against himself and his late father, J.R. (John) Rainey.[2] That letter denied any wrongdoing on his and his brother John, Jr.'s part and was filed with the Maury County Clerk and Master on 17 July 1987 as a pro se answer.

On 24 February 1988, the Mangums filed a "Motion to Add Party Defendants by Counterclaim" which asked that "J.R. Rainey, Jr., William J. Rainey and Coleen F. Rainey" be made defendants to the action pursuant to Tenn.R.Civ.P. 13.08. The court sustained the motion. Then on 26 February 1988, the Mangums filed an "Amended Answer and Counterclaim" which responded to an amended complaint that had been filed by Phillip A. Rainey and William B. Rainey on 23 July 1987. The Mangums' counterclaim, which was in part a cross-claim, named Phillip A. Rainey and William B. Rainey as counter-defendants and J.R. Rainey, Tommy Ray Rainey, William J. Rainey and Coleen F. Rainey as cross-defendants. In their counter and cross-claims, the Mangums asked, *inter alia*, that William J. Rainey be restrained from committing waste on the property of the farm, that they be granted title and right to possession of the farm, and that they recover all rents and profits of the land from William J. Rainey.

On 25 August 1988, John R. Rainey, Jr., Tommy Ray Rainey and Coleen F. Rainey filed a counterclaim and cross-claim against William J. Rainey, Phillip A. Rainey and William B. Rainey asking that Coleen be declared part owner of the farm and that William J. be forced to account for all proceeds that William J. had received as beneficiary for certain life insurance policies and plans that William J. did not use in a proper manner.

On 25 August 1988, the trial court entered an order allowing the substitution of Mary Jo Elam Mangum for Eugene Mangum as party-defendant in the action as a result of Eugene Mangum's death.

Finally, John R. Rainey, Jr., Tommy Ray Rainey and Coleen F. Rainey amended their counterclaim and cross-claim to include as additional parties Phillip Anthony Rainey and Tracy Ann Buttrey, grandchildren of William J. Rainey. The grandchildren were joined because William J. Rainey had purchased, allegedly with proceeds from John Rainey's life insurance and employee benefit plans, three mortgage-backed certificates in his name as their custodian. The trial court subsequently appointed a guardian ad litem to protect the rights of Phillip Anthony Rainey and Tracy Ann Buttrey, who were both minors.

The trial court bifurcated the issue concerning the deed and the issue concerning the accounting of the life insurance proceeds. After the first trial, the trial court entered a preliminary order adjudicating the deed issue and reserving final judgment in the consolidated actions until after the second trial. After the second trial on the insurance accounting issue, the trial court issued a "Findings of Fact, Conclusions of Law and Final Judgment" in regard to both issues. In that order the trial court, *inter alia*, granted all interest in the farm to the Mangums and granted judgment to Coleen Rainey against William J. Rainey for $96,626.90 representing the amount of life insurance and employee benefit plan proceeds William J. Rainey was obligated to pay her. Phillip A. Rainey, William B. Rainey, and William J. Rainey filed a timely appeal to this Court.

## FACTS

William J. Rainey and John R. Rainey were brothers raised in Nashville, Tennessee. When they were young, the brothers apparently experienced more conflict than the average siblings. Partially as a result of this conflict, John, the younger of the two by approximately one and a half years, left Nashville at the age of 17 to join the service.

---

**2.** It is likely that Phillip A. Rainey and William B. Rainey knew that John (J.R.) Rainey was deceased, and thus intended the "J.R. Rainey" to refer to John R. Rainey, Jr. However, since

John, Jr., technically was later joined as a party defendant, we will operate under the assumption that when "J.R. Rainey" appears, it refers to the deceased John R. Rainey.

John settled in the North Carolina area and his marriage to Coleen Rainey produced three children, John R., Jr., Tommy Ray, and Kathy. Kathy was born mentally retarded and physically handicapped. William J. settled in the Nashville area and his marriage to Ann Rainey produced four children, William B., Phillip A., Robert, and Joanna.

William J. and John had disparate educational and work backgrounds. William J. received a high school education and worked in building maintenance and farming for most of his life. John graduated from college and became a computer analyst at Ronson Packaging Corporation in North Carolina.

John and William did not have any contact for several years after John left Nashville. However, the brothers resumed contact in the mid–1970s after William J. accepted an invitation to visit John and his family in North Carolina.

Sometime prior to June of 1978, William J. and John discussed buying a farm together in the Middle Tennessee area. On 9 June 1978, William J. successfully bid $77,-000 for a 157 acre farm (the farm) in Maury County, Tennessee. On that date, William J. signed a sales contract with a provision that "Buyer will instruct Before Closing" to whom the property should be deeded.

Shortly thereafter, William J. contacted John and asked him if he wanted to be a partner in the purchase of the farm. John agreed, and William J. arranged financing with the sellers of the farm to be paid in three annual payments, plus interest. William J. wrote a check for $7,700 representing the ten percent down payment for the farm, which was stamped on the back "For Deposit Only" by the auction company. Although William J. testified that the check was processed through the bank and charged against his checking account, the word "VOID" is written across the front and back of the check in red ink and there are no markings on the check to indicate that it was processed through a bank. William J. was unable to present any evidence that the check was indeed processed.

On 7 July 1978, the deed was filed in the Register's Office of Maury County, Tennessee, with the owners listed as J.R. Rainey and Tommy Ray Rainey. Regardless of this fact, the evidence seems to support William J.'s testimony that his agreement with John provided that he and John would each pay one-half of the purchase price and each would be a half-owner in the farm.

Regarding the down payment and William J. Rainey's insistence that he paid one-half of the annual installments on the farm to his brother John as per the agreement of William J. and John, the trial court found as follows:

William J. Rainey testified under oath that at the auction sale he gave his check for $7,700.00 representing a 10 per cent down payment, and that this check cleared his bank in spite of the fact that it now appears as an exhibit in this case marked "VOID" across its front and back in red letters and contains no other markings which would indicate it had indeed cleared his bank account. In addition, he testifies that he paid one-half of the annual installments on this farm to his brother, yet he has absolutely no evidence he ever paid anything. This Court finds this to be perhaps some of the most incredible testimony this Judge has ever heard in a courtroom after 22 years of law practice. It is just unbelievable and insults the intelligence of this Court.

In a letter dated 7 July 1978, John corresponded with William concerning the purchase of the farm. In that letter, John mentions that "I shouldn't have any trouble making half of the first two notes, adjusted for the tax benefit which I will receive. However, in order to make half of the third note, I will have to sell or get a mortgage on my house." Also in the letter, John informs William J. that he has a $65,000 life insurance policy with one of his sons, John, Jr., named as beneficiary, and that "I will instruct him to use the money upon my death to pay off this obligation, if he refuses, I will change the policy to name you and Tommy as my beneficiaries." John further stated in the letter as follows:

I have also instructed Tommy, upon my death, he must transfer ownership to you or any member of your family which you select. . . .

In the event everything goes right, which I hope, (after or before) the final note is paid. I want my name removed and yours or whichever member of your family you select put on the final deed. I used (after or before) depending on who will get the best tax break.

On 27 January 1981, John wrote William J. another letter which read in part as follows:

Dear Bill:

The other insurance policy cleared. The total for death (not accidental) is $115,225. The total for accidental death is $165,225. Should it happen, and I hope like hell it doesn't, pay off the farm. Put half of it in your kid or kids name and the other half in my kids name (John and Tom, not Kathy). Use what is left over to build a house for Kathy and let whoever, I don't care who, as long as they take the best care of Kathy have the house.

// s //
John

After the farm was purchased, the first two annual payments on the farm were completely paid by checks from John in 1979 and 1980. William J. testified that he sent his half of those payments directly to John, but he did not produce any records to corroborate his testimony. When time came for the third payment, which was a large payment because of the balloon method of financing, William J. allegedly negotiated with the holders of the note for an extension of the regular payments. These later payments were also paid in full by checks written by John, although William J. testified that he sent John the money for one-half of the payments. There is no other evidence that William J. ever made a direct monetary contribution to the purchase of the farm.

Shortly after the farm was purchased, William J. began living on the property. At some point, William J.'s son, Phillip A. Rainey, also began living there with his wife.

On 31 January 1984, John Rainey died intestate while residing and domiciled in the state of North Carolina. He was survived by his wife, Coleen, and their three children, John, Jr., Tommy Ray and Kathleen (Kathy).

Soon after John's death, it became apparent that John had named William J. as beneficiary in all of his life insurance policies and employee benefit plans. Near the time of John's funeral, William J. allegedly promised John's wife Coleen that he would send the insurance proceeds to her as soon as he received them. Shortly thereafter, William J. began receiving checks from various insurance companies and from John's former employer. However, William J. did not forward the funds to Coleen as he had promised.

The trial court found that William J. Rainey, as designated beneficiary of John Rainey, received from the following sources the following amounts of money:

| Source | Type of funds | Amount |
|---|---|---|
| Ronson Packaging Corp. | Retirement and/or life insurance | $ 79,348.32 |
| Ronson Packaging Corp. | Retirement and/or Life Insurance | 7,554.58 |
| American International Life Assurance Co. of New York | Life insurance | 50,000.00 |
| American International Life Assurance Co. of New York | Interest on life insurance | 153.90 |

| Source | Type of funds | Amount |
|---|---|---|
| New York Life Insurance Company | Life insurance plus interest | 30,458.63 |
| New York Life Insurance Company | Life insurance plus interest | 15,111.47 |
| | | $182,626.90 |

---

Eventually, William J. sent Coleen $8,000 of the insurance proceeds. William J. also sent another $20,000 to John's sons John, Jr., and Tommy Ray, and to Billy (William B.), his own son, to be used to start a business. Billy was living in North Carolina with the North Carolina Raineys at that time.

William J. testified that he sent $15,000 to Coleen and $30,000 to "the boys." William J. testified that he used the remaining proceeds to buy three mortgage-backed bonds which were placed in William J.'s name as custodian for two of his grandchildren, Phillip Anthony Rainey and Tracy Ann Buttrey, to buy a grandfather clock for his brother, Edward Rainey, to buy a tractor for the farm, to buy a truck, to pay funeral expenses for a grandson, and to pay off the mortgage on the farm.

On 31 July 1984, William J. persuaded John Rainey, Jr., and Tommy Ray Rainey to transfer title of the farm to "J.R. Rainey" and Tommy Ray Rainey and to two of William J.'s sons, William B. Rainey and Phillip A. Rainey. At that time, the farm had been placed in foreclosure, and William J. threatened to let the farm be sold at foreclosure if John, Jr., and Tommy Ray did not sign the deed transferring the ownership of the farm. Although the original deed listed J.R. Rainey and Tommy R. Rainey as owners, John Rainey, Jr., signed J.R. Rainey to the deed in order to transfer the property. John, Jr., testified that he and his brother only signed the deed because they felt it was the only way that

they could retain any part of their father's estate. John, Jr., admitted that he knew when he signed the deed that the J.R. Rainey on the original deed was his father.

William J. Rainey never recorded the deed that he obtained from John, Jr., and Tommy Ray. However, William J. did use approximately $58,000 of the insurance proceeds from John, Sr.'s policies to pay off the farm before it was sold at foreclosure. William J. also did not record the release he received upon payment of the balance owed on the farm.

On 31 August 1985, Kathleen (Kathy) Rainey, John and Coleen Rainey's mentally retarded daughter, died after undergoing a hysterectomy operation. Coleen Rainey incurred a large amount of expenses for Kathy's medical treatment and burial. When Coleen asked William J. to send her part of the proceeds from John's life insurance policies for Kathy's burial, William J. refused.

Sometime early in 1986, John Rainey, Jr., had the title on the farm researched and discovered that William J. Rainey had not recorded the deed which had changed ownership from J.R. Rainey and Tommy Ray Rainey to William B. Rainey, Phillip A. Rainey, J.R. Rainey, and Tommy Ray Rainey.[3] John, Jr., discovered that the farm was still legally registered in the names of J.R. Rainey and Tommy Ray Rainey.

Subsequently, John, Jr., and Tommy Ray began investigating the possibility of selling the farm to a third party. The brothers obtained the names of several potential buyers from Clive Anderson, one of the

---

3. Although the 31 July 1984 deed names J.R. Rainey as one of the new owners of the property, the deed refers to the owners as all single males. That would lead this Court to believe that the J.R. Rainey in this deed was meant to refer to John Rainey, Jr., rather than his deceased father, John Rainey, especially since John Rainey had been deceased for several months as of July, 1984. However, it is clear that the J.R. Rainey on the deed of record refers to the deceased John Rainey.

persons who had sold the farm to William J. Rainey at the auction. One of the names that John, Jr., and Tommy Ray received from Anderson was Joseph Mangum.

John Rainey, Jr., had some telephone conversations with Joseph Mangum in regard to the possibility of either selling the farm or obtaining a mortgage on it. In early March 1986, John, Jr., and Tommy Ray Rainey traveled to Tennessee to discuss with Joseph Mangum and his brother, Eugene Mangum, the possibility of selling them the farm. The Raineys and the Mangums came to an agreement, and on 6 March 1986 John Rainey, Jr., and Tommy Ray Rainey executed and delivered a deed conveying the farm to Joseph Mangum and Eugene Mangum for the consideration of $72,500. Once again, John Rainey, Jr., signed the deed as J.R. Rainey since the deed still showed ownership in his late father's name. John, Jr., admitted to knowing that the conveyance was illegal, but stated that he and Tommy Ray had no other choice in light of the financial difficulties their mother was experiencing because of Kathy's death and because of her own illness. Five thousand dollars of the purchase price of the farm was escrowed with Norris Jenkins, the attorney who assisted in the transaction, to cover the expense of getting William J. Rainey and his son, Phillip A. Rainey, removed from the farm.

On 7 March 1986, one day after the closing on the sale of the farm to the Mangums, Norris Jenkins wrote a letter to William J. Rainey and Phillip A. Rainey on behalf of the Mangums. In that letter, Jenkins notified William J. and Phillip A. that the farm where they had been living had been purchased by the Mangums and that they must vacate the premises of the farm within 30 days. Shortly thereafter, Phillip A. Rainey and William B. Rainey filed the complaint which initiated the case now on appeal to this Court.

## THE ISSUES

Phillip A. Rainey, William B. Rainey, and William J. Rainey (The Tennessee Raineys) present as their first issue the question of whether "the Chancellor [was] correct in holding that the unrecorded deed from J.R. Rainey and Thomas Ray Rainey to J.R. Rainey, Thomas Ray Rainey, William B. Rainey, and Phillip A. Rainey dated July 31, 1984 was void because procured by fraud, coercion, duress and threat." After a careful review of the record, we affirm the trial court's ruling in regard to this issue.

Although the Tennessee Raineys consistently refer to the transfer by "J.R. Rainey" and Tommy Ray Rainey to "J.R. Rainey" and others, it is clear from the facts that, since J.R. (John) Rainey was deceased at the time of the July 1984 transfer, the "J.R. Rainey" as used by the Tennessee Raineys in that context refers to John Rainey, Jr.

Before we reach the substantive issues regarding the purported transfer of the farm from J.R. Rainey and Tommy Ray Rainey to J.R. Rainey, Tommy Ray Rainey, Phillip A. Rainey, and William B. Rainey, we first must determine who actually held legal title to the farm at the time of that transfer and the amount of their legal interest in the farm.

■ The Tennessee Raineys insist that it was William J.'s and John's intention that William J. own a one-half interest in the farm and John own the other one-half interest. They contend that the farm was deeded in the names of J.R. (John) Rainey and Tommy Ray Rainey in order to facilitate the refinancing of the farm when the balloon payment of the third year came due, since William J. allegedly had bad credit. The Tennessee Raineys further contend that as a result, John held William J.'s one-half interest in trust. In their appellate brief, the Tennessee Raineys present a substantial amount of authority to support the above proposition. This argument would have had some foundation if William J. had paid for his one-half interest as contemplated by William J. and John. As the trial court found, and we concur in the finding, William J. paid nothing. There is nothing in the record that even hints that John intended to make a gift to William J. and in fact William J. does not so contend.

Under the facts here, no trust arose in favor of William J. Rainey.

■ When property is purchased with the money of one person but the title is taken in the name of another, a resulting or presumptive trust arises; the title holder becomes a trustee for the payor. *Shoemaker v. Smith,* 30 Tenn. (11 Humph.) 81 (1850). Although it is undisputed that the original agreement in the instant case contemplated joint ownership in the farm by William J. and John, "[a] trust results from the acts, and not from the agreements, of the parties, or, rather, from the acts accompanied by the agreements." 24 Tenn.Jur. *Trust and Trustees* § 14 at 115 (1985) (citing *Clark v. Timmons,* 39 S.W. 534 (Tenn. Ch.App.1897)).

The evidence shows that all payments made on the farm, except for the $58,000 final payment made with John's life insurance proceeds, were made by John Rainey. William J. Rainey's insistence that he forwarded his one-half of the payments to John is not supported by any evidence. "[I]t is incumbent on the part of him who seeks to establish such trust, to show the payment of the money by clear and unequivocal evidence, in order to displace the presumption that exists in favor of the legal title." *Shoemaker,* 30 Tenn. (11 Humph) at 83.

■ Although we conclude that a resulting trust did not arise in John as trustee for William J., we find that a resulting trust did arise in favor of John with Tommy Ray as trustee. William J. and John intended for a trust to arise with John as trustee for William J. and Tommy Ray as trustee for John. Although the trust in William J.'s favor failed for lack of consideration, John did supply the consideration necessary to create a resulting trust in Tommy Ray as his trustee. As a result, we hold that title to the farm prior to and on the date of the transfer to "J.R.," Tommy Ray, William B., and Phillip A. was all in John Rainey, and after his death, in his heirs.

The transfer at issue took place on 31 July 1984. Prior to that time, on 31 January 1984, John Rainey died intestate. Under the laws of intestate succession of North Carolina, where John Rainey was a resident and domiciled on the date of his death, ownership of the farm passed immediately to his wife and children. Under North Carolina law, one-third of John Rainey's interest vested in his wife, Coleen, and the remaining two-thirds of his interest went to his three children, John, Jr., Tommy Ray, and Kathleen (Kathy) in equal portions. See N.C. Gen. Stat. §§ 29–14(a)(2), 29–15, and 29–16(a)(1). Thus, the ownership of the farm at the time of the transfer at issue was as follows:

Coleen Rainey—3/9ths

John R. Rainey, Jr.—2/9ths

Tommy Ray Rainey—2/9ths

Kathleen (Kathy) Rainey—2/9ths.

■ Although John Rainey, Jr., and Tommy Ray Rainey had the legal ability to transfer at least a part interest in the farm on 31 July 1984, we need not address the question of how much they actually conveyed because we affirm the trial court's finding that the transfer was entirely void because it was "procured by fraud, coercion, duress and threat."

In the counterclaim and cross-claim of John R. Rainey, Jr., Tommy Ray Rainey, and Coleen F. Rainey (the North Carolina Raineys) against the Tennessee Raineys, they allege that the deed of 31 July 1984 "was obtained as a result of fraud and duress."

The North Carolina Raineys base this claim on the alleged fact that: "When the holders of the note began foreclosure proceedings, William J. Rainey threatened John R. Rainey, Jr. and Tommy Ray Rainey with the loss of all interest in and to said property through the foreclosure proceedings, unless they executed a deed, signing the name of their father, so as to establish title in the two of them and the two sons of William J. Rainey."

On appeal, we are to review the facts as found by the trial court de novo with a presumption of correctness. Tenn.R. App.P. 13(d). The trial court found that the 31 July 1984 deed was indeed "procured by fraud, coercion, duress and

threat." Paragraph 11 of the trial court's "Findings of fact, Conclusions of Law, and Final Judgment" states as follows:

On July 31, 1984, William J. Rainey attempted by fraudulent means, amounting almost to extortion, to transfer title to the farm in question in this case to his two sons, William B. Rainey and Phillip A. Rainey, and his two nephews, J.R. Rainey (Jr.) and Tommy Ray Rainey. There was existing at the time of this purported conveyance a mortgage on said farm in the amount of $58,000.00 or more, which had reached foreclosure, and notice of same was being published in the newspaper. William J. Rainey threatened to allow the foreclosure to go through and not pay the debt with the proceeds of the insurance unless this conveyance was completed. He did this knowing that J.R. Rainey, Sr., who was a one-half owner of said farm, had been dead for six months and further knowing that J.R. Rainey, Jr., would have to forge his deceased father's name to this deed. To further enhance this fraud, William J. Rainey never recorded the deed or the release when he did pay the mortgage in cash on August 6, 1984. In short, William J. Rainey attempted to obtain an interest in this farm for his sons by use of intentional fraud, duress and unconscionable conduct.

" 'Duress, under the decisions, means a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do and act or make a contract not of his own volition, but under such wrongful external pressure.' " *Simpson v. Harper*, 21 Tenn.App. 431, 437–38, 111 S.W.2d 882, 886 (1937) (quoting *Pride v. Baker*, 64 S.W. 329 (Tenn.Ch.App. 1901)). Although a determination of whether a party was pressured by duress can be difficult in light of the subjective nature of that party's mental condition at the time, *Wilkerson v. Bishop*, 47 Tenn. (7 Cold.) 24 (1869), "[w]hether such external pressure or influence is sufficient to destroy the free agency of a party, is a question to be determined by the age, sex, intelligence, experience and force of will of the party, the nature of the act, and all the attendant facts and circumstances." 10 Tenn. Jur. *Duress and Undue Influence* § 3 at 112 (1983) (citing *Willard v. Willard*, 65 Tenn. (6 Baxt.) 297 (1873) and *Pride v. Baker*, 64 S.W. 329 (Tenn.Ch.App. 1901)).

In the instant case, William J. Rainey presented John Rainey, Jr., and Tommy Ray Rainey with two options; they could either sign the deed granting a one-half interest to William J. Rainey's sons in exchange for William J. Rainey paying off the mortgage on the farm before it was sold at foreclosure, or they could refuse to sign the deed and allow the farm to be sold at foreclosure. Although John, Jr., and Tommy Ray might have hired an attorney to apprise them of their rights before they signed the deed, such a maneuver could have been enough to cause William J. Rainey to balk at paying off the mortgage and might not have stopped the foreclosure sale of the farm. In order to preserve some interest in the farm, John, Jr., and Tommy Ray felt compelled to immediately sign the deed as instructed by William J. Rainey. Such compulsion would appear to constitute financial duress, which has been recognized as being a legally cognizable claim in Tennessee.

In *Johnson v. Ford*, 147 Tenn. 63, 245 S.W. 531 (1922), the plaintiff was interested in obtaining the water rights to a creek in East Tennessee. Plaintiff negotiated with one of the members of the family which owned the water rights, eventually obtaining a 30–day option to purchase their rights for $10,000. The owners each signed the option at different times, but the date the option was to begin to run was left blank. Relying on the validity of the option, plaintiff entered into negotiations with a company to commit to invest a large amount of money for the proposed development of a manufacturing plant. After approximately $100,000 had been expended and obligated by the plaintiff and the company, the defendants refused to convey their water rights because they had heard that another riparian owner in the same creek had obtained $24,000 for his water rights. Plain-

tiff was "greatly disturbed" by the turn of events. Plaintiff knew that he would not be able to convince the outside company to go through with their commitment to build a manufacturing plant if the issue of the option was to be tied up in court. As a result, plaintiff went to the defendants and "begged and pleaded with them in an effort to get them to comply with their contract" to sell their water rights. Finally, one of the defendants allegedly stated that the water rights could be purchased for $35,000 at that time, and that "on Monday morning, if he lived to get to Johnson City to see a lawyer, it would be $100,000." Finally, plaintiff convinced the defendants to execute another option to buy their water rights for $25,000. After purchasing the water rights, plaintiff sued the defendants for a return of $15,000 as excess payment procured from plaintiff under duress of property. *See Johnson*, 147 Tenn. at 66–74, 245 S.W. at 532–34.

The Tennessee Supreme Court held that under the facts above, the $25,000 payment for the water rights as opposed to the original price of $10,000 was "an involuntary payment made necessary by the fraud and bad faith of the defendants" and that the defendants' actions constituted "duress of property." *Id.* at 95, 245 S.W. at 540. As a result, the Court ordered the terms of the second option enforced but awarded plaintiff a judgment for the $15,000 overcharge. *Id.* at 99, 245 S.W. at 541.

Under the facts here, William J. Rainey's threat to allow the farm to go to foreclosure sale caused John Rainey, Jr., and Tommy Ray Rainey to transfer one-half ownership of the farm to Phillip A. Rainey and William B. Rainey under duress. We therefore affirm the trial court in holding that the deed executed on 31 July 1984 is void and of no effect.

■ The Tennessee Raineys' second issue is whether "the Chancellor [was] correct in divesting all right, title and interest out of all of the Raineys who are parties to this proceeding and vesting it in Joseph H. Mangum and the estate of Eugene Mangum."

This issue is without merit. For the reasons heretofore set forth, the Tennessee Raineys have no interest in the farm. They, therefore, are without standing to raise any question concerning divesture of the rights of all the Raineys, including the North Carolina Raineys.

■ In their final issue, the Tennessee Raineys contend that the trial court erred in granting judgment to Coleen Rainey against William J. Rainey for $96,626.90 and in holding that certain GNMA certificates should be sold and the proceeds used to partially satisfy that judgment. The North Carolina Raineys insist that a resulting trust arose in William J. Rainey for their benefit, and thus the holding of the trial court should be affirmed.

The trial court seemed to base its finding of a resulting trust on two letters to William J. Rainey by John Rainey. The first letter dated 7 July 1978 discusses details about the purchase of the farm and states in part as follows:

I have about $65,000 in life insurance with John Jr. named as beneficiary. I will instruct him to use the money upon my death to pay off this obligation [the farm], if he refuses, I will change the policy to name you and Tommy as my beneficiaries. I have also instructed Tommy, upon my death, he must transfer coownership to you or any member of your family which you select.

The second letter dated 27 January 1981, provides in pertinent part as follows:

The other insurance policy cleared. The total for death (not accidental) is $115,225.00. The total for accidental death is $165,225.00. Should it happen, and I hope like hell it doesn't, pay off the farm. Put half of it in your kid or kids name and the other half in my kids name (John and Tom, not Kathy). Use what is left over to build a house for Kathy and let whoever, I don't care who, as long as they take the best care of Kathy have the house.

As mentioned previously, a resulting trust is an implied trust that courts will find to have arisen under certain circumstances. However, we hold that the letters

above created an express trust in William J. Rainey as trustee for the benefit of Kathy Rainey, and when the trust terminated upon Kathy's death, converted to a resulting trust for the benefit of the North Carolina Raineys.

The Tennessee Raineys assert that the issue of the life insurance proceeds is controlled by the two appellate opinions issued in the case of *Cook v. Cook*, 521 S.W.2d 808 (Tenn.1975) and 559 S.W.2d 329 (Tenn. App.1977). However, we find that case to be inapposite to the facts here.

In *Cook*, the Court held that the trustee of an oral trust, who had been the beneficiary of his brother's life insurance policy, had the discretion to choose how to dispense the trust funds. However, in *Cook*, the object of the trust had not expired; the Court simply held that the trustee had discretion to decide how to use the trust funds for the benefit of the trust beneficiary.

While we have been unable to find a Tennessee case directly on point, *Garner v. Home Bank & Trust Co.*, 171 Tenn. 652, 107 S.W.2d 223 (1937) provides us with helpful guidance.

In *Garner*, the testator executed a will which left his wife certain items of his personal property and a life estate in all of his real property. The will further provided that his residual estate be placed in trust for certain specified purposes. These purposes were to pay all income of the trust to the testator's wife until her death, then to pay $1,000 to Trevecca College, a college in Nashville, Tennessee, and thereafter to pay the income of the trust to the testator's adopted son. The testator's will further provided that the corpus of the trust should be turned over to the son after he had reached twenty-one but before he was twenty-five, and that if the son died without issue before that time, the entire corpus should then be paid to Trevecca College. *Garner*, 171 Tenn. at 654–55, 107 S.W.2d at 223–24.

The income of the trust was paid to testator's wife until her death. However,

the adopted son died without issue more than a year before testator's wife, his adoptive mother. In addition, Trevecca College had become insolvent and was no longer operating as a college. As a result, the purpose of the trust completely failed after the death of the testator's wife. *Id.* at 656–58, 107 S.W.2d at 224–25.

The Court began by saying that, as a general proposition:

> [W]here a person creates a trust fund for the benefit of a particular charity or organization and it is impossible to distinguish any general charitable intent, the fund or property will revert to the donor where it becomes impossible to carry out the purpose of the trust fund even in the absence of an expressed provision for reverter. See Annotation 38 A.L.R., p. 44.

*Garner*, 171 Tenn. at 657–58, 107 S.W.2d at 225. The Court went on to hold that the trust corpus should be distributed to the testator's heirs pursuant to the Tennessee Intestate Succession Statute. The corpus was found to have vested in the testator's heirs—his wife and his adopted son—at the time of testator's death. Since both of them were deceased at the time of the action, the Court awarded one-half of the trust corpus to the heirs of the testator's wife and one-half to the adopted son's natural heirs.[4] *Id.* at 659–61, 107 S.W.2d at 225–26.

The facts of *Garner* and those in the instant case differ somewhat. However, we find them sufficiently analogous to convince us that the life insurance proceeds not used for the purposes set out in the letter from John Rainey to William J. Rainey should revert to John Rainey's estate, and thus should go to John Rainey's intestate heirs.

In *Restatement (Second) of Trusts* § 430 (1959), it is said:

> Where the owner of property gratuitously transfers it upon a trust which is properly declared but which is fully per-

---

4. The intestate laws of that time did not prevent a natural parent from inheriting from a child who had been put up for adoption.

formed without exhausting the trust estate, *the trustee holds the surplus upon a resulting trust for the transferor or his estate, unless the transferor properly manifested an intention that no resulting trust of the surplus should arise.*

*Id.*

Under these facts, we hold that the letters from John Rainey to William J. Rainey created an express trust in William J. Rainey for the benefit of Kathy Rainey. Upon Kathy's death, the trust converted to a resulting trust for the benefit of John Rainey's heirs.

The trial court found that "a resulting trust was established by the terms of the letter" from John Rainey to William J. Rainey. The trial court also found that the amount of money received by William J. Rainey as beneficiary of John Rainey's life insurance policies and retirement plans was $182,626.90, that William J. Rainey used $58,000 of these monies to pay off the mortgage on the farm, and gave $8,000 to Coleen and $20,000 to John, Jr., and Tommy Ray Rainey. As a result, the trial court granted judgment in favor of Coleen Rainey and against William J. Rainey for $96,626.90.

Actually, William J. gave $20,000 to John, Jr., Tommy Ray, and to William J.'s son, Billy. William J. is not entitled to credit for the $6,666.67 he gave his son.

William J. is entitled to credit for the sum of $58,000 paid on the farm mortgage, the $13,333.33 he gave to John, Jr., and Tommy Ray as their share of the $20,000, and the $8,000 which he gave to Coleen. He is entitled to a total credit of $79,333.33.

The full judgment against William J. Rainey should therefore be modified to $103,293.57 representing proceeds he received as beneficiary of John Rainey's life insurance policies and employee benefit plans. However, we further modify the trial court's judgment to conform to our holding that the surplus of the trust should go to John Rainey's estate and thus to his heirs according to the laws of intestate succession of North Carolina. According to N.C.Gen. Stat. §§ 29–14 to 29–16, Coleen, John, Jr., and Tommy Ray Rainey should each receive a one-third share of the surplus of the resulting trust.

The surplus of the resulting trust of $103,293.57 divided by three equals $34,431.19. However, since Coleen Rainey has already received $8,000 from William J. Rainey and John, Jr., and Tommy Ray have each received only $6,666.67, each of them should be credited with one-half of $888.89, or $444.44 each, to be deducted from Coleen's share of the trust surplus.

On remand the trial court shall enter judgment against William J. Rainey for Coleen Rainey in the sum of $33,542.30, against William J. Rainey for John Rainey, Jr., in the sum of $34,875.63, and against William J. Rainey for Tommy Ray Rainey in the sum of $34,875.63. In all other respects the judgment of the trial court is affirmed and costs are assessed to William J. Rainey, Phillip A. Rainey and William B. Rainey. This case is remanded to the trial court for the entry of judgment in conformity with this opinion, the collection of costs, and any further necessary proceedings.

TODD, P.J., and WILLIAM H. INMAN, Special Judge, concur.