# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 22, 2014 Session

## ALISSA OWEN (FORMERLY HAAS) v. DARIN HAAS

**Appeal from the Circuit Court for Montgomery County**
**No. MCCCCVDV11488      Michael R. Jones, Judge**

---

**No. M2013-00950-COA-R3-CV - Filed April 1, 2014**

---

Wife appeals the trial court's denial of her Tenn. R. Civ. P. 60 petition to set aside the marital dissolution agreement and permanent parenting plan in their final decree of divorce; she contends she entered into the agreements under duress due to coercion by her husband. The trial court concluded the marital dissolution agreement and permanent parenting plan were not entered into under duress; the court also found that the permanent parenting plan was in the best interests of the children. Finding the trial court applied the correct legal standards and the evidence does not preponderate against the trial court's findings, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Mark. R. Olson, Clarksville, Tennessee, for the appellant, Alissa Owen.

Stacey Turner Olson, Clarksville, Tennessee, for the appellee, Darin Haas.

## OPINION

Alissa Owen ("Wife") and Darin Haas ("Husband") were married in April 1996 and have three minor children together. Husband is a Lieutenant Colonel in the United States Army and Wife is a school teacher. While Husband was deployed to Afghanistan, Wife engaged in an extramarital affair. Upon his early return, Wife informed him she wanted a divorce. At that time, Husband was suspicious but had no confirmation of an affair.

Wife hired an attorney and filed for divorce on March 11, 2011. In addition to hiring an attorney and filing an Answer, Husband hired a private investigator who confirmed that Wife was having an affair. Husband withheld the fact that he knew of the affair until the

parties' mediation on November 9, 2011. Husband confronted Wife with evidence of her affair at the mediation, immediately following which the parties had a private conversation. Wife subsequently claimed that Husband intimidated her during the private conversation but she did not inform the mediator or her attorney of such during the mediation or at anytime prior to the entry of the final decree of divorce. No agreement was reached during mediation.

Following the failed mediation, Wife had a discussion with her attorney that resulted in her attorney filing a motion to withdraw. The Order Allowing Counsel to Withdraw, entered on November 17, 2011, stated "[Wife] wants to accept a settlement offer from [Husband] that Counsel does not believe is adequate, reasonable or in the best interest of [Wife]."

Wife did not obtain substitute counsel and represented herself thereafter. Husband and Wife had numerous conversations after her counsel withdrew and, by November 18, 2011, Husband began to believe the marriage could be saved. He even arranged a surprise overnight getaway for Wife at Opryland Hotel on November 18; however, after Husband checked in at the hotel Wife declined to go. This made Husband extremely upset and, while at a bar in the hotel, he consumed an excessive amount of alcoholic drinks and proceeded to send multiple text messages to Wife over the evening, all of which were crude.

The parties signed a formalized Marital Dissolution Agreement ("MDA") and Permanent Parenting Plan on November 23, 2011, at Husband's attorney's office; Wife was not represented by counsel. The trial court entered the Final Decree on December 15, 2011, which incorporated the parties agreed MDA and Permanent Parenting Plan.

Five months later, on May 23, 2012, Wife filed a Complaint to Set Aside the Final Decree seeking relief from the final judgment pursuant to Tennessee Rule of Civil Procedure 60. An evidentiary hearing was held on February 15, 2013; the trial court heard testimony from Wife, Husband, and Husband's attorney.

Wife testified that during her private conversation with Husband at the mediation, he pointed his finger at her in an intimidating way, told her she was going to agree to his terms and if she did not agree, he would have her arrested and taken from her classroom in handcuffs.[1] Wife also testified that Husband told her to fire her attorney. Wife testified that she was intimidated and felt as if she was being coerced to reach a mediated settlement, but she chose not to tell the mediator or her attorney. She also stated that Husband threatened

---

[1]The alleged offense, which may or may not have any credence, is not germane to this appeal; thus, we decline to discuss the allegations.

to expose Wife's extramarital affair to the children. Husband denied all allegations of threats or intimidation although admitting he made statements and sending text messages that he now regrets.

In an opinion filed on March 20, 2013, the trial court denied Wife's complaint to set aside the final decree concluding that the MDA was a negotiated settlement that was fair and reasonable on its face. Additionally, the court found that Wife knowingly entered into the agreement against the advice of her attorney. The court also found that Husband did not coerce her into firing her attorney. The trial court stated "there are competing issues in any settlement of a case and in divorce cases one side or both may give in to avoid the consequences of a trial." Further, the trial court found the Permanent Parenting Plan was fair and reasonable and in the best interests of the children.

Wife appealed and presents this court with the issue of whether the trial court abused its discretion in declining to set aside the final decree.

## STANDARD OF REVIEW

A motion for extraordinary relief based on Tennessee Rule of Civil Procedure 60.02 addresses itself to the sound discretion of the trial court, and the scope of review of an appellate court is to determine if that discretion was abused. *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn.1993). Thus, we review the grant or denial of such motion by an abuse of discretion standard and the court's ruling on a Rule 60.02 motion may not be reversed on appeal unless it is determined that the court abused its discretion. *Id*.; *Day v. Day*, 931 S.W.2d 936, 939 (Tenn. Ct. App. 1996).

Rule 60.02, "was designed to strike a proper balance between the competing principles of finality and justice." *Jerkins v. McKinney*, 533 S.W.2d 275, 280 (Tenn. 1976). It allows the court to relieve a party from a final judgment, order or proceeding for the following:

> (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment[.]

Tenn. R. Civ. P. 60.02. The burden is on the party seeking extraordinary relief pursuant to Rule 60.02 to show why extraordinary relief is justified. *Steioff v. Steioff*, 833 S.W.2d 94, 97

(Tenn. Ct. App. 1992) (citations omitted). Rule 60.02, is not intended to "relieve a party from his or her free, calculated, and deliberate choices," rather, relief should be afforded in "the most extreme, unique, exceptional, or extraordinary cases[.]" *Holiday v. Shoney's S., Inc.*, 42 S.W.3d 90, 94 (Tenn. Ct. App. 2000).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). To the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). With respect to legal issues, our review of the denial of Rule 60.02 relief is conducted "under a pure de novo standard of review, according no deference to the conclusions of law made by the lower courts." *See Southern Constructors, Inc. v. Loudon County Board of Education*, 58 S.W.3d 706, 710 (Tenn. 2001).

### ANALYSIS

Wife contends the trial court abused its discretion in declining to set aside the Final Decree, based upon the assertion she was coerced and under duress due to Husband's misconduct at the time she entered into the Marital Dissolution Agreement and Permanent Parenting Plan. We will begin our analysis with the construction of the agreements.

### I. MARITAL DISSOLUTION AGREEMENT AS A CONTRACT

A marital dissolution agreement is a contract and thus is subject to the rules governing the construction of contracts. *Mabee v. Mabee*, M2012-02430-COA-R3-CV, 2013 WL 3355236, at *3 (Tenn. Ct. App. June 27, 2013), appeal denied (Oct. 16, 2013) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006)).[2] The interpretation of a contract is a question of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness under Tennessee Rule of Appellate Procedure 13(d) on appeal. *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). Accordingly, we will review contractual issues de novo and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

---

[2]Although an MDA is bound by a contract analysis, "parents cannot bind the court with an agreement affecting the best interest of their children." *Fletcher v. Fletcher*, M2010-01777-COA-R3CV, 2011 WL 4447903 (Tenn. Ct. App. Sept. 26, 2011) (quoting *Tuetken v. Tuetken*, 320 S.W.3d 262, 272 (Tenn. 2010). Therefore, we will later address whether the agreed arrangement is in the best interests of the children. *Id.*

## II. The Effect of Duress in the Enforcement of a Contract

"Tennessee has long recognized that a contract, although valid on its face, may not be enforceable if it can be proved that the contracting party acted under duress." *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 331 (Tenn. Ct. App. 2009) (citation admitted). This principle is based on the premise that a contract is valid only if it is entered into freely, with the voluntary assent of the parties making it. *Id*.

Duress exists when one, by the unlawful act of another, is induced to make a contract or perform some other act under circumstances which deprives him or her of the exercise of free will. *Johnson v. Ford*, 63, 245 S.W. 531, 538 (Tenn. 1922) (citation omitted). To constitute duress, the danger must not only exist, but must be shown to have actually operated upon the mind, and to have constituted the controlling motive for the performance of the act sought to be avoided. *Russell v. Meharry Med. Coll.*, M2004-01049-COA-R3CV, 2005 WL 2230196, at *5 (Tenn. Ct. App. Sept. 13, 2005) (citing *Wilkerson v. Bishop*, 47 Tenn. 24, (Tenn.1869)). The complainant carries the burden of proof to establish the fact of duress, either by direct or circumstantial evidence. *Wilkerson*, 47 Tenn. at 30. Accordingly, whether a party acted under duress is an issue of fact, which we review de novo with a presumption of correctness to the trial court's finding, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

In determining whether a party acted under duress, the court considers "the age, sex, intelligence, experience and force of will of the party, the nature of the act, and all the attendant facts and circumstances." *Rainey v. Rainey*, 795 S.W.2d 139, 147 (Tenn. Ct. App. 1990) (quoting 10 Tenn. Jur. *Duress and Undue Influence* § 3 at 112 (1983)). We shall discuss each in turn.

The trial court found the ages, intelligence, and life experiences of Wife and Husband to be comparable. Further, it found that based upon the force of Wife's testimony, she is a strong willed person. The evidence in the record does not preponderate against these findings.

As for the nature of the acts, along with the attendant facts and circumstances, the trial court listened to two recorded telephone conversations between the parties submitted into evidence by Husband. The court stated it normally did not put much weight on such recorded calls, however, under the circumstances the court was able to hear the emotion of the parties, particularly the emotions of Wife. The first recorded conversation took place the day after mediation, November 10, 2011. The trial court listened to the conversation several times and provided a partial transcript which it summarized in the March 20, 2013 Opinion.

Paraphrased, Exhibit 4 began with a conversation about the attorneys having talked. The husband stated that [Wife's attorney] talked to [Husband's attorney] and there is no agreement. The wife responded again paraphrased that that was not me (the wife talking) that was [Wife's attorney]. "I promise you, if [my attorney] doesn't do what I want." "We will work it out. [My attorney] told me not to talk with you." "I know I wrecked our lives." "I will make this up to you for the rest of my wife [sic]." "I will take a second job." The husband (again knowing that the conversation is recorded) stated "I still love you. We could stay married." The wife responded "Do this now, No promises. Can we just do this now?" "I can't forgive myself now." "Keep it from the kids please." "Need to work out weekends and Christmas. You have missed out." "As many weekends you like." "We will figure that out." The husband stated words to the effect that we should go out to eat . . . and talk. The wife's response was that she can't eat and "don't know if I will ever eat again."

This conversation portrayed Wife as very apologetic for her actions. It appeared she wanted to come to an agreement even though her attorney had informed Husband's attorney that there was no agreement, evidenced by her statements "I promise you, if [my attorney] doesn't do what I want," "We will work it out," "[My attorney] told me not to talk with you."

The second recording is of the parties' conversation that occurred the following night. Wife's tone was different from the first recording, she was still apologetic, and in response to Husband's question, Wife indicated the affair had ended. There was some discussion from Wife regarding "not seeing anything about deployments" which appeared to be a reference to an agreement the parties had made. Wife further stated, "I'm going to be completely honest, I have not ruled out making this work." Based on the slurring of Husband's words, the trial court believed he was under the influence during this conversation. The trial court paraphrased Husband's statements as he described himself as "still begging [Wife] to take him back," and "blaming himself." Husband also made the statements, "you can have whatever you want. $2,500 per month. All my retirement 80 days." After a disconnection in the phone call, Wife called Husband back and there was discussion about Husband going to lunch with the children, Wife, and Wife's mother. The trial court found that from the sounds of the conversation, Husband must have regurgitated, as Wife's response was "I threw up this morning." She then made the statements, "Can I come over?" "Want me to bring a diet coke or do you still have one?" "I will be there."

The importance of these telephone calls, as the trial court noted, shows there were no threats and, as the trial court found, there was an open discussion that made it appear an agreement had been made or was in progress at that time, evidenced by the parties'

-6-

conversation regarding scheduling and concerns for the family being together at certain times. Moreover, based upon the phone conversations and the parties' testimony, although the trial court was unable to determine the exact date, the court found that the parties had met at Husband's home to draft the agreements either on November 10 or 11.

Wife also presented numerous text messages sent by Husband from Opryland Hotel on November 18, 2011, to evidence Husband's misconduct. In response to Husband's text message tirade, the trial court stated that it appeared Husband apologized in a text message the following day and:

> One must read this response to have some understanding of the husband's tirade. The husband testified that he was sitting at a bar in Opryland Hotel and had 13 alcoholic drinks. It has [sic] been his plan to take the wife to the hotel for the night and the next day to treat her to the spa, etc. The wife had declined to go. There is some evidence in the telephone calls that would make the husband believe that he might have a chance to be together with his wife and children. Reading the remainder of the texts, it is clear that there are no other threats.

Although the text messages are vulgar, as the trial court correctly noted, they the text messages did not contain threats.[3]

Having reviewed the phone conversations, the text messages and the testimony presented at the hearing, and upon consideration of the attending facts and circumstances, we find the evidence does not preponderate against the trial court's findings that Husband did not coerce Wife into firing her attorney, as her words in the phone conversations were essentially, "my lawyer will do what I say," and Wife was not deprived of the exercise of free will. *See Johnson*, 245 S.W. at 538.

### III. PERMANENT PARENTING PLAN

Wife also contended that the Permanent Parenting Plan must be set aside because it is not in the children's best interests, stating she entered into the ill-advised plan under duress.

The trial court is not bound by agreed upon Permanent Parenting Plans; instead, the court is required to "evaluate whether the agreed arrangement is in the best interest of the children." *Fletcher v. Fletcher*, M2010-01777-COA-R3CV, 2011 WL 4447903 (Tenn. Ct.

---

[3]Out of consideration for both parties, we feel it is not necessary to detail the language of the text messages within this opinion.

App. Sept. 26, 2011) (citing *Greer v. Greer*, W2009-01587-COA-R3-CV, 2010 WL 3852321 (Tenn. Ct. App. Sept. 30, 2010)).

> While an agreement on parenting issues would ideally reflect the parties' considered judgment on the arrangement that would best fit the needs of their children, it is also recognized that other factors can come into play in such an agreement, such as the original dysfunction in the parties' relationship, inequality of resources, reluctance to involve the children in the litigation, or even the parties' desire to get the divorce "over with." For that reason, the trial court has broad discretion to determine an appropriate parenting plan in light of the evidence adduced at a hearing and the best interest of the children, even where the parties have reached an agreement on such issues.

*Greer*, at *7.

"Regardless of the parents' interest in a custody arrangement, the overriding responsibility of the court is to approve or order a parenting plan that promotes the best interest and welfare of (the children)." *Burden v. Burden*, 250 S.W.3d 899, 909 (Tenn. Ct. App. 2007) (quoting *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, *5 (Tenn. Ct. App. Oct. 15, 2004)).

Wife and Husband have three minor children, ages twelve, nine, and seven and the parents essentially agreed to a week on and week off parenting time schedule. The parties lived in the same community and agreed the children would not be moved from the area until the youngest child turned 18 years of age. They also agreed that Husband would pay $941 a month in child support, that major decisions would be made jointly, and both parties would maintain health insurance for the benefit of the children.

The trial court found the Permanent Parenting Plan was in the best interests of the children, that it was fair and reasonable on its face, and denied Wife's petition to set it aside.

Decisions regarding parenting schedules often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Thus, a trial court's decision regarding a permanent parenting plan will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

The evidence does not preponderate against the trial court's finding that the Permanent Parenting Plan was in the best interests of the children; accordingly, we affirm the trial court concerning this decision as well as that on the Marital Dissolution Agreement.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against appellant, Alissa Owen.

_____
FRANK G. CLEMENT, JR., JUDGE